## NORTHERN PACIFIC RAILROAD COMPANY *v.* WASHINGTON TERRITORY *ex rel.* DUSTIN.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF WASHINGTON.

No. 24.   Argued March 24, 1891. — Decided January 4, 1892.

Mandamus will not lie to compel a railroad corporation to build a station at a particular place, unless there is a specific duty, imposed by statute, to do so, and clear proof of a breach of that duty.

A petition for a mandamus to compel a railroad corporation to perform a definite duty to the public, which it has distinctly manifested an intention not to perform, is rightly presented in the name of the State, at the relation of its prosecuting attorney, and without previous demand.

The Northern Pacific Railroad Company (whose charter authorized it to locate, construct and maintain a continuous railroad from Lake Superior to Puget Sound, " by the most eligible route, as shall be determined by said company," within limits broadly described, and directed that its

road should " be constructed in a substantial and workmanlike manner, with all the necessary draws, culverts, bridges, viaducts, crossings, turnouts, stations and watering places, and all other appurtenances,") constructed its railroad through the county of Yakima, and stopped its trains for a while at Yakima City, then the county seat and the principal town in the county; but, on completing its road four miles further to North Yakima, a town which it had laid out on its own land, established a freight and passenger station there, and ceased to stop its trains at Yakima City. Thereupon a writ of mandamus was applied for to compel it to build and maintain a station at Yakima City, and to stop its trains there. Afterwards, and before the hearing, Yakima City rapidly dwindled, and most of its inhabitants removed to North Yakima, which became the principal town in the county, and was made by the legislature the county seat; there were other stations which furnished sufficient facilities for the country south of North Yakima; the earnings of this division of the road were insufficient to pay its running expenses; and the passenger and freight traffic of the people living in the surrounding country, considering them as a community, would be better accommodated at North Yakima than at Yakima City. *Held*, that a writ of mandamus should not issue.

A PETITION in the name of the Territory of Washington, at the relation of the prosecuting attorney for the county of Yakima and four other counties in the Territory, was filed in the district court of the fourth judicial district of the Territory, on February 20, 1885, for a mandamus to compel the Northern Pacific Railroad Company to erect and maintain a station at Yakima City, on the Cascade Branch of its railroad, extending from Pasco Junction on the Columbia River up the valley of the Yakima River, and through the county of Yakima, towards Puget Sound, and to stop its trains there to receive and deliver freight, and to receive and let off passengers.

The Northern Pacific Railroad Company was incorporated by act of Congress of July 2, 1864, c. 217, and was thereby " authorized and empowered to lay out, locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph line, with the appurtenances, namely, beginning at a point on Lake Superior, in the State of Minnesota or Wisconsin, thence westerly, by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude to some point on Puget's Sound, with a branch, via the valley of

the Columbia River, to a point at or near Portland in the State of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus; and is hereby vested with all the powers, privileges and immunities necessary to carry into effect the purposes of this act as herein set forth." By § 5 of its charter, it was enacted "that said Northern Pacific Railroad shall be constructed in a substantial and workmanlike manner, with all the necessary draws, culverts, bridges, viaducts, crossings, turnouts, stations and watering places, and all other appurtenances, including furniture and rolling stock, equal in all respects to railroads of the first class when prepared for business, with rails of the best quality, manufactured from American iron; and a uniform gauge shall be established throughout the entire length of the road." And by § 20 it was enacted "that the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military and other purposes, Congress may, at any time, having due regard for the rights of said Northern Pacific Railroad Company, add to, alter, amend or repeal this act." 13 Stat. 366, 368, 372.

The petition set forth at length the size and importance of Yakima City and its need of railroad accommodations; alleged that it was the county seat of Yakima County, a county having more than 4000 inhabitants, and had a courthouse where courts of the United States and of the Territory were held, and a United States land office; that the defendant had refused to establish a freight and passenger station or to stop its trains at Yakima City, but was building a freight and passenger station and stopping its trains at the rival town of North Yakima, four miles further north, which it had laid out on its own unimproved land, and was ruining Yakima City for the purpose of enhancing the value of its own town site.

The answer, filed June 1, 1885, said nothing as to the courthouse; admitted that at the time of filing the petition there

was a United States land office at Yakima City, but alleged that it had since been removed by order of the President of the United States to North Yakima; admitted that Yakima City heretofore had 500 inhabitants, but alleged that since the construction of the defendant's railroad two-thirds of them had removed with their houses and other buildings to North Yakima, and others were continually abandoning it, and no buildings or business were replacing those taken away; denied that it had laid out the town of North Yakima for the purpose of enhancing the value of its own property or for the purpose of injuring the property of any other person, town or city ; and alleged that there was not business enough to warrant more than one station on this part of its road, and that North Yakima was a much larger and more prosperous town than Yakima City ever was, and was a more convenient point for the people of the neighboring valleys, who were more than fifteen times as many, and had more than fifteen times as much taxable property, as the people living in Yakima City and its immediate vicinity.

The parties also made allegations and denials, and (after the filing of a replication not copied in the record) introduced evidence at the trial by a jury, as to the matters afterwards stated in the special verdict, which was returned October 17, 1885, in answer to forty-six questions submitted by the court, and was in substance as follows :

In January, 1885, the defendant carried freight and passengers for hire on its railroad to and from Yakima City, and kept an agent there who attended to the freight and sold tickets to passengers.  But before February 20, 1885, having completed its road to North Yakima, it ceased to stop its trains at Yakima City, and established a freight and passenger station at North Yakima; and, pursuant to § 4 of its charter, tendered its road to the United States as fully completed and equipped from Pasco Junction to or beyond Yakima City, and caused to be appointed by the President of the United States commissioners to examine and report on the condition of the road.  On March 16, 1885, that part of its road from Pasco Junction by Yakima City to North Yakima had not been

turned over to the operating department of the company, but the freight and passenger trains were not run as subordinate to the construction of the road.

In January, 1885, Yakima City was the oldest and largest town, and the most important business centre, on the Cascade Branch of the defendant's railroad, between the Columbia River and Puget Sound. On February 20, 1885, and when the defendant built and operated its road to Yakima City, the amount of business done at Yakima City annually was $250,-000, its population was 500, and there was no other town or business centre of any importance in Yakima County.

On October 17, 1885, Yakima City was the largest town, and the most important business centre in the county, except the town of North Yakima; the population of Yakima City was 150; there were seventy children attending school there; and it had two hotels, a flour mill, thirteen stores and places of business, twenty-seven dwelling houses and but a limited amount of industries requiring railroad facilities. The amount of business furnished by Yakima City to the defendant over that portion of its road between Pasco Junction and North Yakima in the summer of 1885 was in June 16,000 lbs., in July 4000 lbs., in August none, in September 2400 lbs., in October none; and during that period no product of Yakima City or the country adjoining was furnished by any one to be carried over the defendant's road.

There is a safe and suitable place for a freight and passenger station in Yakima City on the line of the defendant's road, and the defendant has the ability to construct and maintain such a station there, with freight and passenger facilities. If the defendant had done so, Yakima City would have retained its former size and importance. No demand was ever made upon the defendant for the establishment of a freight and passenger station there. The expense of constructing and fitting for practical use a station and warehouse at Yakima City would be about $8000, and of keeping the requisite agents there $150 a month. The wear and tear and cost of stopping a train at a station is $1.

The passenger and freight traffic of the people living in the

valleys of the streams entering the Yakima River at and near Yakima City and North Yakima, considering them as a community, would be better accommodated at North Yakima than at Yakima City. There are other stations for receiving freight and passengers on that part of the defendant's railroad, extending from Pasco Junction to North Yakima, called Yakima Division, furnishing sufficient facilities for all the country below North Yakima; and the earnings of that division are not sufficient to pay its running expenses.

On the verdict of the jury and the admissions in the pleadings, each party moved for judgment; and on April 23, 1886, the District Court ordered a peremptory mandamus to issue, in accordance with the prayer of the petition. The record showed that the District Court during the previous proceedings in the case was held at Yakima City, but at the time of rendering judgment was held at North Yakima, to which the county seat and the court-house had been removed pursuant to the statute of the Territory of January 9, 1886. Laws of Washington Territory of 1885–6, pp. 57, 457. On appeal to the Supreme Court of the Territory, the judgment of the District Court was affirmed. 3 Wash. Ter. 303. The defendant thereupon sued out this writ of error, and assigned the following errors:

"First. That the proceedings were not commenced by the proper relator, or in the name or on behalf of the real party in interest.

"Second. That Yakima City is the real party in interest.

"Third. The application and petition do not state facts sufficient to constitute a cause of action.

"Fourth. The findings of the jury are not sufficient to sustain and are inconsistent with the judgment rendered thereon by the court.

"Fifth. The jury found that existing depot and stations between North Yakima and Pasco furnished sufficient railroad-station facilities.

"Sixth. The jury found affirmatively that the railroad, at the time of the application and the return thereto, was in the hands of the railroad contractors and construction department.

" Seventh. That the business furnished said railroad company by said Yakima City and its people and transacted at said Yakima City by said railroad was not sufficient to pay the running expenses of a station at said place.

" Eighth. The jury found that no demand whatever was ever made upon the Northern Pacific Railroad Company for the said station or other depot facilities mentioned in the said application and the judgment of said court.

" Ninth. No facts are found showing any necessity for other or additional stations and facilities than those already furnished.

" Tenth. The charter of the Northern Pacific Railroad Company vests in said company a discretionary power in reference to locating and constructing and maintaining its stations.

" Eleventh. That the matters set forth in the application and findings by the jury are not matters which the law specially enjoins as a duty resulting from an office, trust or station.

" Twelfth. That the judgment affirming the judgment of the District Court rendered on the findings of the jury, and the writ thereon, are vague, uncertain and insufficient, in not directing and defining what said Northern Pacific Railroad Company was to do under said judgment and writ, especially as to the character, kind and class of station and facilities to be furnished, and requires an impossibility, in this, to wit, that said station be constructed immediately."

*Mr. A. H. Garland* for plaintiff in error. *Mr. James McNaught* and *Mr. H. J. May* were with him on the brief.

No appearance for defendant in error.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

A writ of mandamus to compel a railroad corporation to do a particular act in constructing its road or buildings, or in running its trains, can be issued only when there is a specific legal duty on its part to do that act, and clear proof of a breach of that duty.

If, as in *Union Pacific Railroad* v. *Hall*, 91 U. S. 343, the charter of a railroad corporation expressly requires it to maintain its railroad as a continuous line, it may be compelled to do so by mandamus.  So if the charter requires the corporation to construct its road and to run its cars to a certain point on tide water, (as was held to be the case in *State* v. *Hartford & New Haven Railroad*, 29 Conn. 538,) and it has so constructed its road, and used it for years, it may be compelled to continue to do so.  And mandamus will lie to compel a corporation to build a bridge in accordance with an express requirement of statute.  *New Orleans &c. Railway* v. *Mississippi*, 112 U. S. 12 ; *People* v. *Boston & Albany Railroad*, 70 N. Y. 569.

But if the charter of a railroad corporation simply authorizes the corporation, without requiring it, to construct and maintain a railroad to a certain point, it has been held that it cannot be compelled by mandamus to complete or to maintain its road to that point, when it would not be remunerative. *York & North Midland Railway* v. *The Queen*, 1 El. & Bl. 858 ; *Great Western Railway* v. *The Queen*, 1 El. & Bl. 874 ; *Commonwealth* v. *Fitchburg Railroad*, 12 Gray, 180 ; *State* v. *Southern Minnesota Railroad*, 18 Minnesota, 40.

The difficulties in the way of issuing a mandamus, to compel the maintenance of a railroad and the running of trains to a terminus fixed by the charter itself, are much increased when it is sought to compel the corporation to establish or to maintain a station and to stop its trains at a particular place on the line of its road.  The location of stations and warehouses for receiving and delivering passengers and freight involves a comprehensive view of the interests of the public as well as of the corporation and its stockholders, and a consideration of many circumstances concerning the amount of population and business at, or near, or within convenient access to one point or another, which are more appropriate to be determined by the directors, or, in case of abuse of their discretion, by the legislature, or by administrative boards entrusted by the legislature with that duty, than by the ordinary judicial tribunals.

The defendant's charter, after authorizing and empowering it to locate, construct and maintain a continuous railroad "by the most eligible route, as shall be determined by said company," within limits described in the broadest way, both as to the terminal points and as to the course and direction of the road; and vesting it with "all the powers, privileges and immunities necessary to carry into effect the purposes of this act as herein set forth;" enacts that the road "shall be constructed in a substantial and workmanlike manner, with all the necessary draws, culverts, bridges, viaducts, crossings, turnouts, stations and watering places, and all other appurtenances." The words last quoted are but a general expression of what would be otherwise implied by law, and cover all structures of every kind needed for the completion and maintenance of the railroad. They cannot be construed as imposing any specific duty, or as controlling the discretion in these respects of a corporation entrusted with such large discretionary powers upon the more important questions of the course and the termini of its road. The contrast between these general words and the specific requirements, which follow in the same section, that the rails shall be manufactured from American iron, and that "a uniform gauge shall be established throughout the entire length of the road" is significant.

To hold that the directors of this corporation, in determining the number, place and size of its stations and other structures, having regard to the public convenience as well as to its own pecuniary interests, can be controlled by the courts by writ of mandamus, would be inconsistent with many decisions of high authority in analogous cases.

The constitution of Colorado of 1876, art. 15, sec. 4, provided that "all railroads shall be public highways, and all railroad companies shall be common carriers;" and that " every railroad company shall have the right with its road to intersect, connect with or cross any other railroad." Section 6 of the same article was as follows: "All individuals, associations and corporations shall have equal rights to have persons and property transported over any railroad in this State, and no undue or unreasonable discrimination shall be made in charges or

facilities for transportation of freight or passengers within the State, and no railroad company, nor any lessee, manager or employé thereof, shall give any preference to individuals, associations or corporations in furnishing car or motive power." The General Laws of Colorado of 1877, c. 19, § 111, authorized every railroad company." to cross, intersect or connect its railways with any other railway;" "to receive and convey persons and property on its railway;" and "to erect and maintain all necessary and convenient buildings and stations, fixtures and machinery, for the convenience, accommodation and use of passengers, freights and business interests, or which may be necessary for the construction or operation of said railway." This court held that section 6 of article 15 of the constitution of Colorado was only declaratory of the common law; that the right secured by section 4 to connect railroads was confined to their connection as physical structures, and did not imply a connection of business with business; and that neither the common law, nor the constitution and statutes of Colorado, compelled one railroad corporation to establish a station or to stop its cars at its junction with the railroad of another corporation, although it had established a union station with the connecting railroad of a third corporation, and had made provisions for the transaction there of a joint business with that corporation. Chief Justice Waite, in delivering the opinion, said: "No statute requires that connected roads shall adopt joint stations, or that one railroad company shall stop at or make use of the station of another. Each company in the State has the legal right to locate its own stations, and, so far as statutory regulations are concerned, is not required to use any other. A railroad company is prohibited, both by the common law and by the constitution of Colorado, from discriminating unreasonably in favor of or against another company seeking to do business on its road; but that does not necessarily imply that it must stop at the junction of one and interchange business there, because it has established joint depot accommodations and provided facilities for doing a connecting business with another company at another place. A station may be established for the special

accommodation of a particular customer; but we have never heard it claimed that every other customer could, by a suit in equity, in the absence of a statutory or contract right, compel the company to establish a like station for his special accommodation at some other place. Such matters are, and always have been, proper subjects for legislative consideration, unless prevented by some charter contract; but, as a general rule, remedies for injustice of that kind can only be obtained from the legislature. A court of chancery is not, any more than is a court of law, clothed with legislative power." *Atchison, Topeka & Santa Fé Railroad* v. *Denver & New Orleans Railroad*, 110 U. S. 667, 681, 682.

The Court of Appeals of New York, in a very recent case, refused to grant a mandamus to compel a railroad corporation to construct and maintain a station and warehouse of sufficient capacity to accommodate passengers and freight at a village containing 1200 inhabitants and furnishing to the defendant at its station therein a large freight and passenger business, although it was admitted that its present building at that place was entirely inadequate; that the absence of a suitable one was a matter of serious damage to large numbers of persons doing business at that station; that the railroad commissioners of the State, after notice to the defendant, had adjudged and recommended that it should construct a suitable building there within a certain time; and that the defendant had failed to take any steps in that direction, not for want of means or ability, but because its directors had decided that its interests required it to postpone doing so. The court, speaking by Judge Danforth, while recognizing that " a plainer case could hardly be presented of a deliberate and intentional disregard of the public interest and the accommodation of the public," yet held that it was powerless to interpose; because the defendant, as a carrier, was under no obligation, at common law, to provide warehouses for freight offered, or station houses for passengers waiting transportation, and no such duty was imposed by the statutes authorizing companies to construct and maintain railroads "for public use in the conveyance of persons and property," and to erect and maintain all necessary

and convenient buildings and stations "for the accommodation and use of their passengers, freight and business;" and because, under the statutes of New York, the proceedings and determinations of the railroad commissioners amounted to nothing more than an inquest for information, and had no effect beyond advice to the railroad company and suggestion to the legislature, and could not be judicially enforced. The court said: "As the duty sought to be imposed upon the defendant is not a specific duty prescribed by statute, either in terms or by reasonable construction, the court cannot, no matter how apparent the necessity, enforce its performance by mandamus. It cannot compel the erection of a station-house, nor the enlargement of one." "As to that, the statute imports an authority only, not a command, to be availed of at the option of the company in the discretion of its directors, who are empowered by statute to manage 'its affairs,' among which must be classed the expenditure of money for station buildings or other structures for the promotion of the convenience of the public, having regard also to its own interest. With the exercise of that discretion the legislature only can interfere. No doubt, as the respondent urges, the court may by mandamus also act in certain cases affecting corporate matters, but only where the duty concerned is specific and plainly imposed upon the corporation." "Such is not the case before us. The grievance complained of is an obvious one, but the burden of removing it can be imposed upon the defendant only by legislation. The legislature created the corporation upon the theory that its functions should be exercised for the public benefit. It may add other regulations to those now binding it, but the court can interfere only to enforce a duty declared by law. The one presented in this case is not of that character. Nor can it by any fair or reasonable construction be implied." *People* v. *New York, Lake Erie & Western Railroad,* 104 N. Y. 58, 66, 67.

In *Commonwealth* v. *Eastern Railroad,* the Supreme Judicial Court of Massachusetts, in holding that a railroad corporation, whose charter was subject to amendment, alteration or repeal at the pleasure of the legislature, might be required by

a subsequent statute to construct a station and stop its trains at a particular place on its road, said : " If the directors of a railroad were to find it for the interest of the stockholders to refuse to carry any freight or passengers except such as they might take at one end of the road and carry entirely through to the other end, and were to refuse to establish any way stations, or do any way business for that reason, though the road passed for a long distance through a populous part of the State, this would be a case manifestly requiring and authorizing legislative interference under the clause in question. And on the same ground, if they refuse to provide reasonable accommodation for the people of any smaller locality, the legislature may reasonably alter and modify the discretionary power which the charter confers upon the directors, so as to make the duty to provide the accommodation absolute. Whether a reasonable ground for interference is presented in any particular case is for the legislature to determine ; and their determination on this point must be conclusive." 103 Mass. 254, 258.

Upon the same principle, the Supreme Judicial Court of Maine compelled a railroad corporation to build a station at a specified place on its road in accordance with an order of railroad commissioners, expressly empowered by the statutes of the State to make such an order, and to apply to the court to enforce it. Maine Stat. 1871, c. 204; *Railroad Commissioners* v. *Portland & Oxford Railroad,* 63 Maine, 270.

In *Southeastern Railway* v. *Railway Commissioners*, a railway company was held by Lord Chancellor Selborne, Lord Chief Justice Coleridge and Lord Justice Brett, in the English Court of Appeal, to be under no obligation to establish stations at any particular place or places unless it thought fit to do so ; and was held bound to afford improved facilities for receiving, forwarding and delivering passengers and goods at a station once established and used for the purpose of traffic, only so far as it had been ordered to afford them by the railway commissioners within powers expressly conferred by act of parliament. 6 Q. B. D. 586, 592.

The decision in *State* v. *Republican Valley Railroad,* 17

Nebraska, 647, cited in the opinion below, proceeded upon the theory, (inconsistent with the judgments of this court in *Atchison &c. Railroad* v. *Denver & New Orleans Railroad*; and of the Court of Appeals of New York in *People* v. *New York &c. Railroad*, above stated,) that, independently of any statute requirements, a railroad corporation might be compelled to establish a station and to stop its trains at any point on the line of its road at which the court thought it reasonable that it should.

The opinions of the Supreme Court of Illinois, though going farther than those of most other courts in favor of issuing writs of mandamus to railroad corporations, afford no countenance for granting the writ in the case at bar. In *People* v. *Louisville & Nashville Railroad*, 120 Illinois, 48, a mandamus was issued to compel the company to run all its passenger trains to a station which it had once located and used in a town made a terminal point by the charter and which was a county seat; because the corporation had no legal power to change its location, and was required by statute to stop all trains at a county seat. In *People* v. *Chicago & Alton Railroad*, 130 Illinois, 175, in which a mandamus was granted to compel a railroad company to establish and maintain a station in a certain town, the petition for the writ alleged specific facts making out a clear and strong case of public necessity, and also alleged that the accommodation of the public living in or near the town required, and long had required, the establishment of a station on the line of the road within the town; and the decision was that a demurrer to the petition admitted both the specific and the general allegations, and must therefore be overruled. The court, at pages 182, 183, of that case, and again in *Mobile & Ohio Railroad* v. *People*, 132 Illinois, 559, 571, said: "It is undoubtedly the rule that railway companies, in the absence of statutory provisions limiting and restricting their powers, are vested with a very broad discretion in the matter of locating, constructing and operating their railways, and of locating and maintaining their freight and passenger stations. This discretion, however, is not absolute, but is subject to the condition that it must be exercised

in good faith, and with a due regard to the necessities and convenience of the public." But in the latter case the court also said: "The company cannot be compelled, on the one hand, to locate stations at points where the cost of maintaining them will exceed the profits resulting therefrom to the company; nor allowed, on the other hand, to locate them so far apart as to practically deny to communities on the line of the road reasonable access to its use. The duty to maintain or continue stations must manifestly rest upon the same principle, and a company cannot, therefore, be compelled to maintain or continue a station at a point when the welfare of the company and the community in general requires that it should be changed to some other point." page 570. "The rule has been so often announced by this court that it is unnecessary o cite the cases, that a mandamus will never be awarded unless the right to have the thing done which is sought is clearly established." page 572. And upon these reasons the writ was refused.

Section 691 of the Code of Washington Territory of 1881, following the common law, defines the cases, in which a writ of mandamus may issue, as "to any inferior court, corporation, board, officer or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station." By the same code, in mandamus, as in civil actions, issues of fact may be tried by a jury ; the verdict may be either general or special, and, if special, may be in answer to questions submitted by the court; and material allegations of the plaintiff not denied by the answer, as well as material allegations of new matter in the answer not denied in the replication, are deemed admitted, but a qualified admission cannot be availed of by the other party, except as qualified. §§ 103, 240, 242, 694, 696; *Breemer* v. *Burgess,* 2 Wash. Ter. 290, 296 ; *Gildersleeve* v. *Landon,* 73 N. Y. 609. The replication filed in this case, not being copied in the record sent up, may be assumed, as most favorable to the defendant in error, to have denied all allegations of new matter in the answer.

The leading facts of this case, then, as appearing by the

special verdict, taken in connection with the admissions, express or implied, in the answer, are as follows : The defendant at one time stopped its trains at Yakima City, but never built a station there, and, after completing its road four miles further to North Yakima, established a freight and passenger station at North Yakima, which was a town laid out by the defendant on its own unimproved land, and thereupon ceased to stop its trains at Yakima City. In consequence, apparently, of this, Yakima City, which at the time of filing the petition for mandamus was the most important town, in population and business, in the county, rapidly dwindled, and most of its inhabitants removed to North Yakima, which at the time of the verdict had become the largest and most important town in the county. No other specific facts as to North Yakima are admitted by the parties or found by the jury. The defendant could build a station at Yakima City, but the cost of building one would be $8000, and the expense of maintaining it $150 a month, and the earnings of the whole of this division of the defendant's road are insufficient to pay its running expenses. The special verdict includes an express finding (which appears to us to be of pure matter of fact, inferred from various circumstances, some of which are evidently not specifically found, and to be in no sense, as assumed by the court below, a conclusion of law) that there are other stations for receiving freight and passengers between North Yakima and Pasco Junction, which furnish sufficient facilities for the country south of North Yakima, which must include Yakima City; as well as an equally explicit finding (which appears to have been wholly disregarded by the court below) that the passenger and freight traffic of the people living in the surrounding country, considering them as a community, would be better accommodated by a station at North Yakima than by one at Yakima City. It also appears of record that, after the verdict and before the District Court awarded the writ of mandamus, the county seat was removed, pursuant to an act of the territorial legislature, from Yakima City to North Yakima.

The mandamus prayed for being founded on a suggestion that the defendant had distinctly manifested an intention not

to perform a definite duty to the public, required of it by law, the petition was rightly presented in the name of the Territory at the relation of its prosecuting attorney; *Attorney General* v. *Boston,* 123 Mass. 460, 479; Code of Washington Territory, § 2171; and no demand upon the defendant was necessary before applying for the writ. *Commonwealth* v. *Allegheny Commissioners,* 37 Penn. St. 237; *State* v. *Board of Finance,* 9 Vroom, 259; *Mottu* v. *Primrose,* 23 Maryland, 482; *Attorney General* v. *Boston,* 123 Mass. 460, 477.

But upon the facts found and admitted no sufficient case is made for a writ of mandamus, even if the court could under any circumstances issue such a writ for the purpose set forth in the petition. The fraudulent and wrongful intent, charged against the defendant in the petition, is denied in the answer, and is not found by the jury. The fact that the town of North Yakima was laid out by the defendant on its own land cannot impair the right of the inhabitants of that town, whenever they settled there, or of the people of the surrounding country, to reasonable access to the railroad. No ground is shown for requiring the defendant to maintain stations both at Yakima City and at North Yakima; there are other stations furnishing sufficient facilities for the whole country from North Yakima southward to Pasco Junction; the earnings of the division of the defendant's road between those points are insufficient to pay its running expenses; and to order the station to be removed from North Yakima to Yakima City would inconvenience a much larger part of the public than it would benefit, even at the time of the return of the verdict. And, before judgment in the District Court, the legislature, recognizing that the public interest required it, made North Yakima the county seat. The question whether a mandamus should issue to protect the interest of the public does not depend upon a state of facts existing when the petition was filed, if that state of facts has ceased to exist when the final judgment is rendered. In this regard, as observed by Lord Chief Justice Jervis in *Great Western Railway* v. *The Queen,* already cited, "there is a very great difference between an indictment for not fulfilling a public duty, and a mandamus commanding the

party liable to fulfil it." 1 El. & Bl. 878. The court will never order a railroad station to be built or maintained contrary to the public interest. *Texas & Pacific Railway* v. *Marshall*, 136 U. S. 393.

For the reasons above stated, the judgment of the Supreme Court of the Territory must be reversed, and the case remanded, with directions to enter judgment for the defendant dismissing the petition; and Washington having been admitted into the Union as a State by act of Congress passed while this writ of error was pending in this court, the mandate will be directed, as the nature of the case requires, to the Supreme Court of the State of Washington. Act of February 22, 1889, c. 180, §§ 22, 23; 25 Stat. 682, 683.

*Judgment reversed, and mandate accordingly.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE FIELD and MR. JUSTICE HARLAN, dissenting.

I dissent from the opinion and judgment in this case.

The question is not whether a railroad company can be compelled to build a depot and stop its trains at any place where are gathered two or three homes and families; nor whether courts can determine at what locality in a city or town the depot shall be placed; nor even whether, when there are two villages contiguous, the courts may determine at which of the two the company shall make its stopping place, or compel depots at both. But the case here presented is this: A railroad company builds its road into a county, finds the county seat already established and inhabited, the largest and most prosperous town in the county, and along the line of its road for many miles. It builds its road to and through that county seat; there is no reason of a public nature why that should not be made a stopping place. For some reason, undisclosed, perhaps because that county seat will not pay to the managers a bonus, or because they seek a real estate speculation in establishing a new town, it locates its depot on the site of a "paper" town the title to which it holds, contiguous to this established county seat; stops only at the one, and refuses to stop at the

other; and thus, for private interests, builds up a new place at the expense of the old; and for this subservience of its public duty to its private interests, we are told that there is in the courts no redress ; and this because Congress in charter- ing this Northern Pacific road did not name Yakima City as a stopping place, and has not in terms delegated to the courts the power to interfere in the matter.

A railroad corporation has a public duty to perform, as well as a private interest to subserve, and I never before believed that the courts would permit it to abandon the one to promote the other. Nowhere in its charter is in terms expressed the duty of carrying passengers and freight. Are the courts im- potent to compel the performance of this duty? Is the duty of carrying passengers and freight any more of a public duty than that of placing its depots and stopping its trains at those places which will best accommodate the public? If the State of Indiana incorporates a railroad to build a road from New Albany through Indianapolis to South Bend, and that road is built, can it be that the courts may compel the road to receive passengers and transport freight, but in the absence of a specific direction from the legislature, are powerless to compel the road to stop its trains and build a depot at Indianapolis? I do not so belittle the power or duty of the courts.