(69 App. Div. 549.)

PEOPLE ex rel. LINTON v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. March 14, 1902.)

1. STREET RAILROADS—OPERATION—MANDAMUS.
    Mandamus to compel a railroad company to do a particular act in constructing its road or in running its trains can be issued only when there is a specific legal duty to do the act, and clear proof of a breach of such duty.

2. SAME—POWERS OF DIRECTORS—PARALLEL LINES.
    General Corporation Law (Laws 1892, c. 687) § 29, provides that the affairs of every corporation shall be managed by its directors. Railroad Law (Laws 1890, c. 565) § 4, directs that every railroad corporation may regulate the time and manner in which passengers and property shall be transported; and section 34 requires every railroad corporation to run its cars at regular times, to be fixed by public notice, and furnish sufficient accommodations for passengers. Held, that a lessee of systems of elevated railroads, discontinuing parallel lines, and operating only one of them, and then only during certain hours of the day, but transferring its passengers to its surface road without charge, cannot be compelled by mandamus to operate such parallel lines, in the absence of allegations that it had not furnished a reasonable service, since a company may operate its trains on a fixed schedule at any hour of the day or night which best subserves its purposes.
    Hirschberg, J., dissenting

Appeal from special term, Kings county.

Petition for mandamus, on relation of Edward F. Linton, against the Brooklyn Heights Railroad company. From an order directing the issuance of the writ, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Charles A. Collin, for appellant.
Stephen C. Baldwin (Benjamin N. Cardozo, on the brief), for the People.

WOODWARD, J. The law is well settled that a writ of mandamus to compel a railroad corporation to do a particular act in constructing its road or buildings or in running its trains can be issued only when there is a specific legal duty on its part to do that act, and clear proof of a breach of that duty. Railroad Co. v. Dustin, 142 U. S. 492, 498, 12 Sup. Ct. 283, 35 L. Ed. 1092; People v. New York, L. E. & W. R. Co., 104 N. Y. 58, 66, 67, 9 N. E. 856, 58 Am. Rep. 484. And the jury having found, upon a trial of the issues raised by an alternative writ of mandamus, that "public ne-

cessity or convenience require that the defendant operate its elevated road system from and between the termini at the Brooklyn Bridge and Broadway Ferry and the terminus at Cypress Hills in the manner the same was operated prior to the 1st day of April, 1900," and the learned court at special term having granted an order in conformity with this finding, we are to determine whether there is a specific legal duty on the part of the defendant to operate its railroad in the manner prevailing prior to April 1, 1900; for if no such duty has been imposed upon the defendant, either by the common law or by statute, it is not within the province of the courts to say in what manner a quasi public corporation shall discharge its duty to the public. Such matters are, and always have been, proper subjects for legislative consideration, unless prevented by some charter contract; and remedies for inconveniences or injustices suffered by reason of the failure of such corporations to meet our ideals can only be obtained from the legislature. This court is not clothed with legislative power. Railroad Co. v. Dustin, 142 U. S. 502, 12 Sup. Ct. 283, 35 L. Ed. 1092, and authorities there cited. "The grievance complained of is an obvious one," say the court in People v. New York, L. E. & W. R. Co., supra, "but the burden of removing it can be imposed upon the defendant only by legislation. The legislature created the corporation upon the theory that its functions should be exercised for the public benefit. It may add other regulations to those now binding it, but the court can interfere only to enforce a duty declared by law." The primary object of the writ of mandamus is to compel action. It neither creates nor confers power to act, but only commands the exercise of powers already existing, when it is the duty of the person or body proceeded against to act without its agency. While it may require the performance of a purely ministerial duty in a particular manner, its command is never given to compel the discharge of a duty involving the exercise of discretion or judgment in a specified way, for that would substitute the judgment or discretion of the court issuing the writ for that of the person or persons against whom the writ was issued. People v. Land Office Com'rs, 149 N. Y. 26, 30, 43 N. E. 418, and authorities there cited. Having these fundamental propositions in mind, we will consider some of the provisions of law in relation to corporations of the character of the defendant, and then examine the facts to determine whether they constitute a sufficient ground for the interference of this court with the management of the defendant's railroad.

Section 29 of the general corporation law (chapter 687, Laws 1892) provides that the "affairs of every corporation shall be managed by its board of directors"; and section 4 of the railroad law (chapter 565, Laws 1890) says that, subject to the limitations and requirements of this chapter, every railroad corporation, in addition to the powers given by the general and stock corporation laws, shall have power "* * * (8) to regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor." Section 34 of the same statute provides:

"Every railroad corporation shall start and run its cars for the transportation of passengers and property at regular times, to be fixed by public notice, and shall furnish sufficient accommodations for the transportation of all passengers and property which shall be offered for transportation at the place of starting, within a reasonable time previously thereto, and at the junctions of other railroads, and at the usual stopping places established for receiving and discharging way passengers and freight for that train; and shall take, transport and discharge such passengers and property at, from and to, such places, on the due payment of the fare or freight legally authorized therefor."

It appears, therefore, that, subject to the limitations last above mentioned, the legislature has specially delegated to the defendant the power to regulate the time and manner in which passengers and property shall be transported; and this would seem to be broad enough to permit the board of directors, in managing the affairs of the defendant, to operate its trains upon a fixed schedule at any hours of the day or night which, in its judgment, might best serve the purposes of the corporation; and, as the primary purpose of the defendant may be presumed to be the earning of dividends, it may be assumed that the trains would be run at such hours as the public convenience demands, and a failure to operate them at all hours of the day, or on Sundays and legal holidays, would not be an abandonment of the road, in any legal sense.

In Com. v. Fitchburg R. Co., 12 Gray, 180, the court had before it the precise question whether the running of regular passenger trains was, under the facts admitted in the demurrer, a legal duty; and, after a careful consideration of the question in a historical light, the court suggested that:

"Upon a line of railroad of much travel, and where the public convenience required frequent trains for the carriage of goods, a corporation would not discharge its duty by furnishing trains wholly inadequate to meet the public wants; much less, if it wholly neglected or failed to make any provision whatever to meet the public wants."

But the court adds:

"It is plain that the power to judge of what is necessary or reasonable in the premises is, except in those cases where the legislature has expressly intervened, in the first instance, in the corporation. It is clear, also, that the duty required is not more than to meet and supply the public wants."

In reply to the suggestion that the duty is not relative, but absolute; that it is not to be measured by the public wants and exigencies at the time, but is to be performed at all hazards, or at any sacrifice, unless or until the legislature shall interpose to relieve the corporation from its performance,—the court say:

"This position cannot be sustained. If it had been intended that the duty of running trains should be absolute, it would have been made definite. But the question at once arises, when and how often is this duty to be discharged? Is a train to be run whenever a passenger shall desire to go, or are there to be fixed times, and, if so, how frequent? To settle these questions, you would have to refer to the public wants, and these could be measured only by the business done. If trains run at reasonable and moderate fares cannot be supported, it is because they are not needed."

The court, speaking of the corporation, adds:

"It would seem to be, therefore, not only its right, but its duty, to exercise a sound discretion in the use of its capital, lest, by exhausting it upon trains

that were not required by the public wants, it should deprive itself of the means of running at reasonable rates those that were."

Again, it was said, in answer to the suggestion that, the railroad company having for a time operated its road in a particular manner, it was bound to continue the particular system until authorized to change by the legislature, that:

"We cannot see that a beginning to run these trains rendered their continuance, at whatever cost or sacrifice, a legal duty. It might be more plausibly said that it was the duty of the corporation, after a road was built, to make the trial of running regular trains for passengers and freight; that they were not to presume beforehand that the business would be inadequate; that it was difficult to foresee or anticipate all the business which would find its way to the road, and therefore the experiment should be fairly made. But when trial had been fairly made, and had proved disastrous, the duty would have been discharged."

Taking the facts to be as stated by the relator, he has been a resident of the Twenty-Sixth ward of the borough of Brooklyn for 30 years. During that time elevated railways had been constructed in Brooklyn by the Brooklyn Elevated Railway Company, the Union Elevated Railroad Company, and the Sea Side & Brooklyn Bridge Railroad Company. In February, 1899, the system of elevated roads in the borough of Brooklyn passed to the ownership and control of the Brooklyn Union Elevated Railroad Company, and on or about April 1, 1900, the Brooklyn Union Elevated Railroad Company leased all of the said railroads belonging to the system, with all of the structures, etc., to the Brooklyn Heights Railroad Company, the appellant in this proceeding. At this time there were two distinct and continuous lines which had their terminus at Cypress Hills. One started from the Brooklyn Bridge and ran through Fulton street to East New York, thence to Cypress Hills. The other started at the Broadway Ferry, and ran through Broadway to Crescent street, and through Crescent street to Cypress Hills. On both of these lines a continuous service from terminus to terminus was maintained up to about August 15, 1900, when the defendant inaugurated a new system. The old station at Manhattan Crossing was torn down or remodeled, and a new station, known as the "Loop," was erected in its stead; and the arrangement was such that the two lines of railroad were connected at this point, trains being enabled to pass from one road to the other. On August 15, 1900, the Brooklyn Heights Railroad Company discontinued the direct service between the Brooklyn Bridge and the Broadway Ferry with Cypress Hills on Sundays and holidays, and upon week days between the hours of 10 a. m. and 4 p. m., and between the hours of 8 p. m. and 5 a. m. That is, during the days and hours named the trains of the Brooklyn Heights Railroad Company ran only from the bridge or the ferry to the loop, and returned thence to the place of starting; passengers for Cypress Hills being transferred, without extra cost, to the street surface cars of the company, which are operated directly underneath one of the elevated lines, and by this surface line carried to their destination. The distance from the loop to Cypress Hills is about two miles. The surface line is operated by electricity, and there is no allegation that the defendant has not provided a sufficient number of cars to carry

the traffic in a reasonable manner, or that it has not operated such cars upon a published schedule, and in a regular and orderly manner. The effect of this arrangement is that at a point where the old lines converged, and from which they were closely paralleled to the terminus at Cypress Hills, the Brooklyn Heights Railroad Company operates but one line of elevated railroad, instead of two, and that during certain hours of the day and night it does not operate its cars over this one line, but transfers its passengers to the street surface railroad without extra charge; and the question presented is whether this is such an abandonment of the road, or such a misuse of its franchise, as to warrant the court in directing that the defendant shall go back to the system prevailing prior to April 1, 1900. We are clearly of the opinion that it is not. There is nothing in the railroad law which makes it the duty of the defendant to operate its trains over the entire system during all hours of the day and night, nor yet upon Sundays and legal holidays. It is specially given the power to regulate the time and manner in which passengers and property shall be transported (subdivision 8, § 4, Railroad Law); and it is not disputed that during the "rush" hours it does operate its trains between the Brooklyn Bridge and Cypress Hills, as well as between Broadway Ferry and the same point, upon regular schedules, while at all times it operates an electric car, with free transfers, to connect with the trains at the loop. It operates its entire system between all of the terminal points, so far as we are able to discover, in entire good faith, and with a view to an economical management of the property; and, as the legislature has delegated the power to determine when passengers and property shall be transported over all railroads to the corporations owning the same, we are unable to discover any power in the court to order the defendant to do any differently than it is now doing. In People v. Rome, W. & O. R. Co., 103 N. Y. 95, 109, 8 N. E. 369, it was said that:

"Where a railroad company owns by consolidation two lines of road, and can substantially accommodate the people of the state by operating one line between the same points, and can abandon the other line without any serious detriment to any considerable number of people, we do not believe it should be compelled by mandamus to operate both lines, at a great sacrifice of money, upon the fanciful idea that the sovereignty of the state is wounded by its omission to operate both lines."

While it may be that the defendant is not justified in occupying the highway with the structure which is no longer used, we are convinced that no interest of the public requires the economic waste incident to the operation of two closely paralleled railroads, where one is abundantly able to take care of all of the traffic. Whether the present method of taking care of its passengers is the best one,—whether it is an improvement upon the system in vogue prior to April 1, 1900,—is not for this court to determine. That is a question left to the discretion of the board of directors of the defendant, and the legislature is alone competent to make a different rule of conduct for the corporation of its creation. It is not to be doubted that this court would have the power to compel the defendant to operate cars over its entire line between the terminals, if the corporation

in fact neglected to perform this duty; but there is no evidence to support the conclusion that the defendant does not operate its lines both between Cypress Hills and Broadway Ferry and Cypress Hills and the Brooklyn Bridge, supplementing this service by its surface trolley lines between the loop and Cypress Hills, and the time and manner of operating the cars over these lines is specially delegated to the board of directors of the owning corporation.

A careful examination of the authorities discovers no case in which the courts have, in the absence of a specific legal duty, undertaken to prescribe the manner in which a railroad shall be operated; nor do we find any suggestion that it is the duty of a railroad corporation to run all of its trains over all of its tracks between all of its terminals, while in the practical operation of railroads it is well known that trains are put on to run between certain points at shorter intervals than the regular through trains, and that a large number of contrivances are systematically resorted to in the effort to economize in the carrying of traffic. In People v. Rome, W. & O. R. Co., supra, the defendant, by consolidation, had become the owner of the Syracuse & Northern Railroad Company. After the consolidation it had two lines from Pulaski station to Washingtonville, a direct line about seven miles long, and a circuitous line by way of Richmond about two miles longer. The short line was abandoned, and passengers between the two points were obliged to travel about two miles further than on the old line; but the court held that the defendant was substantially performing the duty imposed by law, and laid down the rule above cited. In People v. New York Cent. & H. R. R. Co., 28 Hun, 543, the defendant had, under the pretext that it was unable to operate its road, by reason of a strike among its employés, refused to accept and carry freight to and from the city of New York, and the court held that mandamus would lie to compel the discharge of the duty which it had undertaken:

"The duties imposed must be discharged at whatever cost. They cannot be laid down or abandoned or suspended without the legally expressed consent of the state. The trusts are active, potential, and imperative, and must be executed until lawfully surrendered; otherwise a public highway of great utility is closed or obstructed without any process recognized by law. This is something no public officer charged with the same trusts and duties in regard to other public highways can do, without subjecting himself to mandamus or indictment."

In People v. Albany & V. R. Co., 24 N. Y. 261, 82 Am. Dec. 295, the defendant had constructed its road between Albany and Eagle Bridge, and subsequently abandoned so much of the route as lay between Eagle Bridge and Waterford Junction. The attorney general brought an action to restrain the company from taking up and selling the iron, and demanded that the company be directed to reopen and operate the road for its entire length. The complaint was dismissed, and on appeal the court held that the court was without equitable jurisdiction to compel the operation, and suggested mandamus; but a majority of the court, passing upon the question, did not concur in the reasoning of the learned jurist who wrote the opinion, and the case decides nothing of importance in the present case.

In Re Loader, 14 Misc. Rep. 208, 35 N. Y. Supp. 996, 999, the facts and decision are analogous to those in People v. New York Cent. & H. R. R. Co., supra; this case being cited as authority. In Railroad Co. v. Hall, 91 U. S. 343, 23 L. Ed. 428, the statute under which the road was constructed provided that the "whole line of the railroad and branches and telegraph shall be operated and used for all purposes of communication, travel, and transportation, so far as the public and government are concerned, as one connected, continuous line"; and, when the company refused to operate its lines over a bridge which was held to constitute a portion of the railroad, the court issued a writ of mandamus to compel obedience to the provisions of the law. "The mandamus awarded in this case, therefore," say the court, "imposes no duty beyond what the law requires." In Illinois Cent. R. Co. v. People (Ill.) 33 N. E. 173, 19 L. R. A. 119, the statute under which the railroad was operated provided that "all regular passenger trains shall stop a sufficient length of time at the railroad station of county seats to receive and let off passengers with safety." The railroad company operated a fast mail train, which carried several passenger coaches, between points in Illinois and New Orleans; and this train deviated from the original route of the company, passing about three miles from the station in the city of Cairo, a county seat. A short train was run out from the city to connect with this train, and the Illinois supreme court held that this did not meet the requirements of the law, and a mandamus issued. This case was carried to the United States supreme court, and reversed upon the ground that the statute of Illinois was an interference with interstate commerce and with the United States mails, and was not a proper police regulation. Illinois Cent. R. Co. v. Illinois, 163 U. S. 142, 16 Sup. Ct. 1096, 41 L. Ed. 107. In Brownell v. Railroad Co., 164 Mass. 29, 41 N. E. 107, 29 L. R. A. 169, 49 Am. St. Rep. 442, the defendant had come into possession of a ferry which by act of the legislature had been made a part of its railroad. The court say:

"The present case is merely an instance of compelling a railway company to operate its entire line. The legislature has seen fit to pass an imperative statute to this effect. In view of this statute, it is not open to the railroad company to determine that the ferry should be discontinued while all the rest of its various lines are operated."

And so we come back to the rule stated in the opening of this discussion,—that a writ of mandamus to compel a railroad company to do a particular act in constructing its road or buildings, or in running its trains, can be issued only when there is a specific legal duty on its part to do that act, and clear proof of a breach of that duty. Railroad Co. v. Dustin, 142 U. S. 492, 498, 12 Sup. Ct. 283, 35 L. Ed. 1092, and authorities reviewed and cited in this case. Certainly it cannot be successfully contended that there was ever any specific legal duty to operate the road of the defendant in the particular manner in which it was operated on or before the 1st day of April, 1900. While the court may require the performance of a purely ministerial duty in a particular manner, its command is never given to compel the discharge of a duty involving the exercise of judgment or discretion in any specified way, for that would substitute the judgment or

discretion of the court issuing the writ for that of the person or corporation against whom the writ was issued. People v. Land Office Com'rs, 149 N. Y. 26, 30, 43 N. E. 418, and authorities there cited. Admitting, then, the facts as found by the jury, there is no basis in law for the issuance of the writ of mandamus. The legislature created the corporation on the theory that its functions should be exercised for the public benefit. It may add other regulations to those now binding it, but the court cannot interfere, except to enforce a duty declared by law. People v. New York, L. E. & W. R. Co., 104 N. Y. 58, 67, 9 N. E. 856, 58 Am. Rep. 484.

The order should be reversed, with costs. All concur, except HIRSCHBERG, J., who dissents.