[No. 7321.   Decided June 4, 1909.]

THE STATE OF WASHINGTON, *on the Relation of J. S. Whitehouse et al., Appellant*, v. NORTHERN PACIFIC RAILWAY COMPANY, *Respondent.*[1]

RAILROADS—REGULATION—SERVICE—OPERATION OF THROUGH TRAINS —CHARTER—MANDAMUS. The original charter of the Northern Pacific Railway Company, authorizing it to maintain and enjoy a "continuous railroad" between its terminals, does not require it to operate all its through passenger trains from terminus to terminus; but it maintains and enjoys a "continuous railroad" from terminus to terminus when it operates one passenger train daily each way directly between its terminals without change of cars or deviation, affording adequate service for all who desire to travel over its line; and mandamus will not issue to require it to do more.

SAME. It would be immaterial that its through trains were not run over the main line as originally laid out, where changes were made to reduce curves and grades, and the old line received an adequate local service.

Appeal from a judgment of the superior court for Pierce county, Reid, J., entered February 12, 1907, denying a writ

[1]Reported in 102 Pac. 24.

of mandamus to compel the operation of through passenger trains, after a trial on the merits before the court.   Affirmed.

*Boyle, Warburton, Quick & Brockway,* for appellant.
*B. S. Grosscup* and *W. C. Morrow,* for respondent.

MOUNT, J.—The relators brought this action in the court below by writ of mandamus, to compel the Northern Pacific Railway Company to run all its through passenger trains directly into and out of the city of Tacoma, without deviating from the main line and without change of cars or transfer of passengers, mail, or express matter.   Issues of fact were joined, and upon a trial the court denied the writ.   The relators have appealed.

There is no substantial dispute in the facts.   They are stated, we think, fairly in respondent's brief in substance as follows:   By the act of July 2, 1864, Congress incorporated the Northern Pacific Railroad Company and authorized and empowered it:

"To lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph line with the appurtenances, viz., beginning at a point on Lake Superior in the state of Minnesota or Wisconsin, thence westerly by the most eligible railroad route as shall be determined by said company within the territory of the United States on the line north of the 45th degree of latitude to some point on Puget Sound, with a branch via the valley of the Columbia river to a point at or near Portland, in the state of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus."   13 Stats. at Large, 365.

Pursuant to this and other acts and joint resolutions, large bodies of land were granted in aid of the road, which was constructed from the eastern terminus at Ashland, Wisconsin, to Tacoma, on Puget Sound.   As originally constructed it passed through the towns of Enumclaw, Buckley, South Prairie, and Orting.   The Northern Pacific Railroad Company subsequently went into the hands of a receiver.   The en-

tire property of the company was sold at mortgage sale in 1896, at which time the road was bought in by the Northern Pacific Railway Company, the present respondent, which has owned and operated the road ever since. The respondent, Northern Pacific Railway Company, was incorporated under the laws of the state of Wisconsin, by special act. Chapter 244 of the Laws of 1895. Prior to the mortgage sale, the Northern Pacific Railroad Company had operated from Meeker Junction to Seattle over the tracks of the Northern Pacific & Puget Sound Shore and the Columbia & Puget Sound. The Northern Pacific & Puget Sound Shore was constructed from Meeker Junction to Black River Junction. From Black River Junction it had the right to use the roadbed of the Columbia & Puget Sound to Seattle, together with the right to lay rails thereon and to operate trains thereover. The property of the Northern Pacific & Puget Sound Shore was acquired by respondent at the time it acquired the property of the Northern Pacific Railroad Company; so that the line from Meeker Junction to Seattle became a part of this respondent's lines and property at the time of the foreclosure sale in 1896.

About the year 1900 this respondent completed what is known as the Palmer cut-off, a branch line leaving the old main line at Palmer Junction and running in a westerly direction to the town of Auburn, which is located on the line between the cities of Tacoma and Seattle. This cut-off reduced the distance from Palmer Junction to Tacoma by way of Auburn about three miles over the original line known as the Buckley line passing through the towns of Enumclaw, Buckley, South Prairie, and Orting, before mentioned. By reason of the superiority of the Palmer cut-off over the Buckley line, with respect to relative curves and grades, the through trains of the respondent were thereafter run over the cut-off. The old Northern Pacific Railroad Company furnished but one through train a day each way. At the time of and prior to the hearing of this case, the respondent was

operating two solid trains each way daily between St. Paul, Minnesota, and Puget Sound, being known as trains Nos. 1 and 2, commonly known as the North Coast Limited, and trains Nos. 3 and 4, commonly known as the Pacific and Twin City Express. It was also operating a third train, Nos. 5 and 6, commonly known as the Burlington train, which ran between St. Paul, Minnesota, and Seattle, Washington, but required a change of cars at Billings, Montana, where connections were made with the solid through Burlington train between Kansas City and Seattle. Train No. 1, being westbound, left the old line at Palmer Junction and ran over the cut-off to Auburn, thence to Seattle, and thence over the same line to Auburn, and on to Tacoma and Portland, Oregon; while train No. 2, being eastbound, ran from Portland to Tacoma, thence through Auburn to Seattle, thence back again to Auburn, thence by way of the cut-off to the east, the city of Tacoma being given, as auxiliary to the solid train above mentioned, a stub train to Auburn for the accommodation of persons not wishing to take the through train at Tacoma. Number 3, being westbound, ran from Auburn directly to Tacoma and Portland. Train No. 4, being eastbound, ran from Tacoma to Auburn, and thence east over the Palmer cut-off but without running into Seattle, the latter city being served by a stub connection from Auburn with trains Nos. 3 and 4. Trains Nos. 5 and 6 ran directly to and from Seattle.

At the time of the trial, there were three regular through passenger trains operated by respondent. One originated and terminated at Tacoma, the second originated and terminated at Seattle, and the other, a solid train, through both the above cities on its way between Portland, Oregon, and St. Paul, Minnesota. The North Coast Limited train is limited as to stopping places and also as to the number of cars in the train. Physical conditions and limited time prohibit more than nine cars between St. Paul and Seattle. It carries an observation car, is lighted by electricity, and makes bet-

ter time than the other trains.   This train westbound runs
over the Palmer cut-off to Auburn, at which place it is met
by a stub train upon which passengers bound for Tacoma
may, if they so elect, come on directly to their destination, or
they may remain on the train, arriving at Tacoma about four
hours later.   The Tacoma mail is brought directly on the
stub from Auburn to Tacoma.   Train No. 1 proceeds as a
solid train to Seattle, a distance of twenty-one miles, arriv-
ing there at 9:30 p. m.   This train leaves Seattle for Ta-
coma and Portland at 10:20 p. m., arriving at Tacoma at
11:50 p. m., departing for Portland at 12:05 a. m., and ar-
riving at the latter city at 7 a. m.   This train between Seat-
tle and Portland loses its limited character in that it takes on
extra sleeping cars at Seattle and Tacoma, drops off the ob-
servation car, makes many local stops, and runs at a com-
paratively slow rate.   Eastbound this train is known as No.
2.   It leaves Portland at 2 o'clock p. m., arrives at Tacoma
at 7:20 p. m., leaves Tacoma at 7:35 p. m., and, passing
through Auburn arrives at Seattle at about 9:30 p. m.; leav-
ing there almost immediately for the east, it returns to Au-
burn, going east over the Palmer cut-off.   Tacoma passen-
gers may take this train as it passes through Tacoma, or at
their option may take the Puget Sound Limited, leaving Ta-
coma for Seattle at 9:40 p. m., making immediate connec-
tion at Auburn with No. 2.   Trains Nos. 1 and 2 were in-
stalled about the time the Palmer cut-off was constructed,
and have been operated in the manner they are now operated
since the cut-off was completed.

It appears, that this North Coast Limited train was put
on to meet the active competition of the Great Northern and
Canadian Pacific companies; that Seattle is a competitive
point, and furnishes the bulk of the business for this train
—more than is furnished by Tacoma and all points south,
including Portland; that the train consists of an observation
car, one standard sleeping car, one tourist sleeping car, a din-
ing car, a first-class day coach, a second-class day coach, and

mail, express and baggage cars; that the apparatus for furnishing the electric light is carried in the baggage car; that in order to divide this train at Auburn, sending one part to Seattle and another part to Tacoma, it would be necessary to add at least three coaches to the train, besides an extra baggage car, which would so enlarge the train that it would render it impossible for it to run fast enough to compete with the other roads for the business, and that if such an order were made it would be necessary for respondent to discontinue this train entirely.

It appears that Seattle furnishes almost exactly three times as much passenger business to respondent as does Tacoma, and in point of population the former city is more than one-half as large again. For the last three years the total volume of business in Seattle is more than twice the volume in Tacoma. The North Coast Limited is a very expensive train to operate by reason of the superior character of the equipment, the limitation as to the number of passengers it can accommodate, the increased speed at which it travels, and the resulting detention imposed upon the other trains; that without the passenger business furnished by Seattle it would not be possible for respondent to maintain this fast limited train, and that in order to get this competitive business it is absolutely necessary to run into Seattle as a solid train; that under these methods of operation, the time from St. Paul to Tacoma made by this train is over four hours less than the time made by No. 3; that by reason of operating this train so as to secure the great amount of passenger business originating and terminating at Seattle, the citizens of Tacoma are given a superior through service to St. Paul, which is over four hours shorter than can be made by a regular through train operated in the ordinary manner.

It also appears that under the present arrangement the city of Tacoma is furnished adequate and reasonable service by respondent. It also appears that the Buckley line is

a line of excessive grades and curves, the grades being as
high as one and eight-tenths, with ten degree curves. The
line has also numerous reverse curves. It is difficult to
maintain it by reason of mountain streams, and it is in many
respects greatly inferior to the Palmer cut-off. The dis-
tance to Tacoma is three miles greater by the Buckley line
than by the cut-off. It is also shown that the Buckley line
cannot be improved so as to render it equal to the cut-off
line within any reasonable expense. The Buckley line has
not been abandoned, but is now served by two local trains
daily each way.

Voluminous briefs and arguments have been filed in the
case, and many points argued, but the main contention of
the appellant is that, under the provisions of the original
charter to the effect that respondent "is hereby authorized
and empowered to lay out, locate, construct, furnish, main-
tain and enjoy a *continuous railroad*" from Lake Superior
to Puget Sound, the railroad company must run *all* its reg-
ular through passenger trains, and particularly the North
Coast Limited trains, directly into and out of the city of
Tacoma, the western terminus of the road. Appellants do
not contend that there is any statute which specificially re-
quires the railway company to operate all its trains directly
from the eastern terminus of the road to the western termi-
nus without deviation, but they contend that the charter
provision above quoted which authorizes the railway com-
pany to construct and maintain a *continuous railroad*, re-
quires all through trains operated over such road to be run
directly from one terminus to the other. They cite no cases
directly in point upon this question, but they rely upon the
case of *Union Pacific Railroad Company v. Hall*, 91 U. S.
343, 23 L. Ed. 428. That was a case where the charter re-
quired that "the whole line of the railroad . . . shall
be operated and used for all purposes of communication,
travel, and transportation so far as the public and govern-
ment are concerned as one connected, continuous line," and

where the railroad company was not using the road as a continuous line, but had constructed a bridge across the Missouri river between Council Bluffs and Omaha, which bridge was not used as a part of the continuous line of the Union Pacific Railroad Company, but was operated by another company composed of its own employees, by the use of transfer trains, and special rates were charged therefor. None of the trains of the railroad company crossed this bridge. The supreme court of the United States held in that case that the railroad company was bound to operate and run the whole road, including the bridge, as one connected, continuous line. In that case it appears that the court required the railroad company to run all its trains over the bridge, but the point that all through passenger trains must run direct from terminus to terminus without deviation or change was neither considered nor decided in that case.

That case cannot control this, for it cannot be maintained in this case that the Northern Pacific Railway is not operated as a continuous line from terminus to terminus. It is conceded that at least one train daily leaves Tacoma for St. Paul and *vice versa*, and runs directly through without change of cars or deviation from the main line; and it is established if not conceded that this train, with the accommodation afforded by the other two, furnishes adequate service for all who desire to travel over the line. It necessarily follows from this that the road is furnished, maintained, and enjoyed as a *continuous railroad* from terminus to terminus.

"A writ of mandamus to compel a railroad company [corporation] to do a particular act . . . in running its trains can be issued only when there is a specific legal duty on its part to do that act, and clear proof of a breach of that duty." *Northern Pac. R. Co. v. Washington Territory*, 142 U. S. 492, 12 Sup. Ct. 283, 35 L. Ed. 1092.

There is no statute or common law duty which requires the respondent to do more than maintain a continuous line

of railroad between Lake Superior and Tacoma. This is required by the charter of the company, as above stated. When the railway company maintains one direct through train daily each way, which train furnishes adequate and reasonable service, its legal duty is fully met, and a writ of mandamus will not issue to require it to do more. The facts that other trains with better equipment are operated over the line and run faster, or make side trips on branch lines, or make local stations only between points on the main line, are clearly all matters of operating detail which, if not regulated by law, must be regulated and controlled by the company itself.

From the showing made we are satisfied that the respondent was justified in running its through train by way of Auburn. The road as originally constructed has not been abandoned. Two regular local trains each day are run over that line, affording adequate facilities to points thereon. It certainly cannot be held that the road must always be maintained and operated exactly in the same place it was first built. It must naturally be repaired, curves and grades must be reduced, and changes made to meet the growing demands of commerce and competition. This is what appears to have been done.

We find no merit in the appeal. The judgment must therefore be affirmed.

RUDKIN, C. J., CROW, DUNBAR, and FULLERTON, JJ., concur.