## EQUAL FACILITIES MUST BE FURNISHED TO ALL BY RAILROAD COMPANIES.

[Common Pleas Court of Franklin County.]

### JOHNSON COAL MINING COMPANY V. THE HOCKING VALLEY RAILROAD COMPANY.

Decided, January 16, 1904.

*Railways—Statutory and Common Law—Requiring Equal Opportunities to All for Receiving and Shipping Freight—Unjust Discrimination—The Remedy in Section 3373-1 Exclusive to What Extent—Equity will Interfere by Injunction to Afford Equal Facilities to All, When—Circumstances where the Remedy in Damages is Inadequate—Doctrine of Equitable Interference Founded on What—The Receiving of Freight from Private Tracks—A Connection Between a Private Track and the Tracks of a Railroad is a "Facility" within the Meaning of the Common Law.*

1. The statute of Ohio (Bates, 3373-1) requiring railroad companies to extend equal opportunities and facilities to all persons receiving or shipping freight, is only declaratory of the common law applicable to the same subjects and confers no new rights.

2. The remedy provided in said statute, rendering any such company violating its provisions amenable in damages to any person injured by discrimination, in a sum in any case of not less than five hundred dollars, is an exclusive remedy only as to those claims not exceeding that amount. In all other respects the remedy there provided is affirmative only of the common law.

3. A court of equity will not assume to dictate the policy or business management of a common carrier, aside from its clear duty under its charter or the statutes. That function belongs exclusively to the company itself and will not be interfered with, because changes ought to be made as apparently reasonable, necessary or otherwise. But where the common carrier itself adopts as a part of its business policy any advantageous facility for handling freight, it must not discriminate in its use by the public, but must afford the facility equally to all, and to this extent equity will interfere by injunction to prevent such favored use thereof and compel its equal service to all.

4. In a case of discrimination as set forth in this case, where the nature of the complaining coal company's business consists in mining coal which necessitates long continued and indeterminable series of shipments, a remedy by damages in an action at law would lead to such a multiplicity of suits and involve such uncer-

tainty in the measure of damages, that the remedy of damages would be inadequate and resort may be had to a court of equity.

5. The doctrine on which a court of equity will compel the acceptance of freight or the furnishing of equal facilities by a common carrier is founded, not so much upon the purely private rights of the individual as upon the general rights and benefit of the public at large, whose interest it is to keep free and open the channels of trade, and to prevent the building up of favored private enterprises by a *quasi* public corporation.

6. It is not a taking of private property in violation of the Fourteenth Amendment to the Constitution of the United States to compel a railroad company to receive freight in car load lots from private tracks of the shipper, where the company has extended the means and facilities for so receiving such cars on its tracks to other shippers similarly situated and under like circumstances, and where the complaining shipper offers to comply with all the rules, conditions and regulations which the company finds necessary to prescribe in that behalf equally to all patrons.

7. Irrespective of the nature, character, ownership or control of a sidetrack or private "switch" which a shipper himself may build or which may be constructed under regulations of the railroad company, the essential facts involved in this case is the opening or cutting by a railroad company of its tracks to receive car load shipments from such side-track. Such opening or connection is a "facility" within the meaning of the common law requiring facilities to be furnished equally to all who comply with the regulations of said company.

DILLON, J.

The sufficiency of the petition in this case is questioned by demurrer. The petition alleges that the defendant is a railroad company chartered under the laws of the state of Ohio, operating as a public corporation and a common carrier of frieght and passengers on lines extending from Lake Erie on the north to the Ohio river on the south, with branch lines of its own, and also connecting with numerous railroads operating throughout the United States; that the plaintiff is engaged in mining and selling coal, and owns a tract of coal land of about twenty-one hundred acres, located in Athens county, Ohio, and for a distance of about one mile adjoining and on each side of the main line of the defendant company. The plaintiff has constructed and developed mines on said land, equipped them with modern machinery necessary to carry on the business of mining and shipping

large quantities of coal, the capacity being an output of about three thousands tons of coal per day. It has, among other modern equipment, a tipple for loading direct on cars, and has constructed side-tracks thereto leading up to the main track of the defendant company. The petition further alleges that the construction of said switch has been made in a careful and proper manner for connection with said main track; that it has large orders for quantities of coal to be delivered to Columbus, Ohio, Chicago, Illinois, and other points which can be shipped only on defendant's line of railroad. It is further alleged that the defendant has permitted other coal companies located in the same and adjoining counties, and under conditions exactly similar to those surrounding plaintiff, to connect with its main track —the names and location of probably a score of such mines being given. And it is alleged that the defendant company made such connections at its own expense and furnishes cars and switching facilities, etc., to said companies, and in that manner receives the freight for shipment. The plaintiff has offered to prepay the cost of making the connection, and has tendered the coal as freight to be loaded as is that of its competitors; has offered to comply with all the defendant company's rules and regulations as applied to other shippers, and has demanded connection to be made as a matter of right. To operate the mine profitably or successfully it is impossible to haul the coal to a regular station, the modern and advanced system and conditions of mining requiring the same facilities as are alleged to be given by the defendant to other mine owners above.

There is also an allegation that the defendant railroad company has violated its charter by purchasing some of the mines named, or controlling or owning the stock in them, but in this action these allegations may doubtless be disregarded for the purpose of deciding the question raised by the demurrer.

The defendant having refused the connection, plaintiff says it has no adequate remedy at law, and prays for mandatory injunction compelling the defendant to permit the plaintiff to make the connection, or to make the connection at plaintiff's expense prepaid, and that the defendant be ordered to furnish

the plaintiff its share of coal cars and receive them for shipment, etc.

There are a number of other averments in the petition which I will not repeat, but the foregoing sufficiently shows the nature of the relief sought.

The defendant demurs on the ground that the facts stated do not constitute a cause of action. And (as also embraced in this demurrer) on the further ground that the plaintiff has an adequate remedy at law.

The question before the court, therefore, is substantially this: If a common carrier of coal as freight affords to certain coal shippers the means and facilities to load from the tipple direct into the cars on a switch connection with its main track, may the remedy of mandatory injunction be properly invoked to compel the carrier to provide the same facilities to others similarly situated and with business of like inducement?

This question is, of course, most closely allied to the old doctrine of the common law forbidding a public carrier to discriminate or to deny equal facilities to its patrons. Concerning that general doctrine there is no question. Indeed it has long since been thoroughly and well settled that it is not a proper business of any common carrier to foster particular enterprises, but on the other hand it is bound to deal fairly with the public, and is bound to extend to all its reasonable facilities for the transportation of their property, and it must put all its patrons upon equality and furnish to them equal facilities for handling of freight. It is bound to receive goods from all persons alike without making distinctions and without giving any unjust or unreasonable advantages by way of facilities for carriage or rates for transporting them.

In the case at bar we are concerned, however, not as to whether the defendant has the right to discriminate, but as to whether the plaintiff is entitled at the hands of a court of equity to the particular remedy of mandatory injunction. The defendant, admitting the well established doctrine that a common carrier shall not discriminate, concedes that only two remedies might exist in a case of this kind—first, quo warranto, in its nature

punative and exemplary; second, the specific remedy of damages in an action at law.

On the other hand the plaintiff claims that its right to this remedy of mandatory injunction arises from three sources:

First.    That conferred by the common law, growing out of the duty of every common carrier to treat its shippers alike and without any discrimination as above outlined.

Second.    The rights conferred by the statutes of Ohio.

Third.    The rights conferred by the act of Congress of the United States, usually called the Interstate Commerce Law.

I shall dispose first of this last claim as to whether or not the case at bar is one embraced in the Interstate Commerce Act.

By Section 16 of that act the jurisdiction to enforce its provisions is expressly conferred upon the Circuit Court of the United States sitting in equity in the judicial district in which the common carrier complained of has its principal office, or in which the violation or disobedience of such order or requirement shall happen, and the said court shall have power to hear and determine the matter.

Whatever rights, therefore, the plaintiff may claim to possess by virtue of that act must be sought through means and channels expressly provided for in that act. And when those have been complied with and a suit is necessary, the jurisdiction is expressly and exclusively conferred upon the United States Circuit Court.

There remain for consideration, therefore, the rights of plaintiff at common law and those existing by virtue of the statute. The Ohio enactment (Bates, 3373-1) is as follows:

"It shall be the duty of all railroad companies and of all persons operating a railroad, to secure and extend to all persons, companies and corporations, the same and equal opportunities and facilities for receiving and shipping freights of all kinds, of the same class that such railroad company or the persons operating such railroad, extends to, has used or enjoys, of and concerning freights owned by such railroad company, or the person operating such road or any of the officers or stockholders therein, or in which it, they or either of them have any interest in. A railroad company or person operating any railroad failing to comply with or observe the provisions or requirements of this

section, shall be liable in civil action to the party injured for the damages sustained, but for any violation of this section the recovery in such action shall be not less than five hundred dollars."

If the rights conferred by the foregoing statute arise by virtue of the statute exclusively, it follows that the remedy here given is exclusive. In other words if this statute imposes a new duty on the railroad company not required by the common law, or gives the shipper a new right not granted by the principles of the common law, it follows both by reason and authority that the remedy which is provided with the creation of the right is exclusive unless the act itself limits this rule.

But if a new remedy only is given by the statute for a right of action existing independently of and without excluding the other remedies already known to the law, a proper construction would be that the statutory remedy is additional or cumulative merely.

It is evident, therefore, that if the plaintiff is entitled to the relief of mandatory injunction prayed for, it must arise from common law, for the remedy of damages is either declaratory of a remedy already existing at common law, or is cumulative to remedies already existing, or is a remedy provided for new rights not known to common law, and therefore in derogation thereof and exclusive. I am of opinion that the said statute is substantially declatory of the common law doctrine and is not in derogation thereof nor in addition thereto. It follows, therefore, that the remedy is merely declaratory except as to claims under $500.

We must pass therefore to the rights of the plaintiff in the premises at common law. The cases from the earliest times to the present day denying to a common carrier the right to discriminate or to deny equal facilities are numerous and profuse. They have embraced almost every form of discrimination. It has remained for the recent years to produce slowly the decisions on questions similar to the one at bar and develop the law applicable thereto. Not only is the method of loading coal direct into a car on a switch comparatively modern, but it is not unreasonable to suppose that another reason why this question has not become better settled is that railroad companies have generally

been anxious to encourage business, and therefore have not been wont to deny a switch where there was reasonable prospect of profitable business.

In our own state, to illustrate the attitude of our courts upon this question of discrimination, we have a very clear expression in our Supreme Court in the case of *Scofield* v. *Railroad Company,* 43 Ohio State, 571. The first syllabus announces the broad doctrine that "A railroad company, organized under the statutes of Ohio, is a common carrier, and is subject to judicial control to prevent the abuse of its powers and privileges."

By the sixth syllabus the court holds that:

"Where it appeared that the plaintiffs' business was such as to make them frequent shippers, and that a continuous series of shipments was necessary in conducting their business, and that a remedy sought by actions at law would lead to a multiplicity of suits—*Held:* The court will intervene by injunction to prevent a multiplicity of suits, and it is not a prerequisite that the plaintiffs should have first established their rights by an action at law."

In *State* v. *Railway Company,* 47 Ohio State, 130, the court holds in the second syllabus:

"A corporation, created by this state, and engaged in carrying goods for hire, as a common carrier, has no franchise, privilege or right to discriminate in its freight rates in favor of one shipper, even when it is necessary to do so to secure his custom, if the discrimination rate will tend to create a monopoly by excluding from their proper markets the products of competitors of the favored shipper."

A case well considered is that of *Brundred* v. *Rice,* 49 Ohio State, 640. This case discusses at length the rights of the railroad company and its shippers, and the general subject of discrimination is discussed at great length.

Another Ohio case is found in *Lake Shore Railway Company* v. *Scofield,* 2d C. C., 305. In this case the railroad company permitted the Standard Oil Company to ship its oil in large tanks known as tank cars, this method of shipment being more advantageous and profitable than the old method. But the railroad company refused to receive the plaintiff's oil in such form that compelled the plaintiff to ship in barrels. This was held

to be discrimination for which the plaintiff was entitled to damages.

Another form of discrimination is illustrated in the case of *Coal Company* v. *The Erie Railroad Company*, decided by the Circuit Court of Cuyahoga County, December 6, 1902, and which will be found in Volume 1, No. 26, of THE OHIO LAW REPORTER (*Youghiogheny & Ohio Coal Co.* v. *Erie Ry. Co.*, 1 Circuit Court Reports—New Series, page 333). In this case the railroad company and one of its favored shippers had purchased a machine for rapid and economical unloading of coal cars to boats and barges. That whereas the former slow and laborious method of unloading the cars was cumbersome, costly and time consuming, the new machine would pick up a car and empty it bodily. Previously to the suit the railroad company had sold out its entire interest in the machine to the favored shipper; yet the court held that this machine was devoted to a public use and the company could not grant the exclusive use thereof to any one shipper.

Passing from the state of Ohio to the decisions of United States courts and to the decisions of other states we find the methods of discrimination to take almost every form known to the trade, and without encumbering this opinion with too many excerpts, it is noticeable that the courts have steadily endeavored to repress discrimination in every form it has shown itself.

As to the case at bar and the remedy here sought it is probably safe to say that no case containing exactly the same set of circumstances has been found by the research of counsel. I find the question raised a few times under somewhat similar circumstances, and I note that it' has been approached but carefully avoided in a number of decisions. Perhaps the following quotation from the case of *Stock Yards Company* v. *Railroad Company*, 67 Federal Reporter, 35, by Taft, J., will illustrate the situation, which has presented itself in a great many cases: The court says:

"We are brought therefore to the issue whether or not there is any discrimination between those who have side-track connections on Front street and the complainant. This depends on two questions: First—Is it a discrimination which can be controlled or restrained by the courts for a railroad company to furnish a side-track to one of its customers, or to refuse such accommodation to another similarly situated? Second—Conced-

ing an affirmative answer to the first question, is there such a difference between the facilities demanded by the complainant and those extended to its neighbors * * * by the railway company, in granting them, as to justify the latter in making the distinction it insists upon.

"The first question is one full of difficulty, both at common law upon the principles of which this case must be decided, and also under the Interstate Commerce Act. Because we are able to satisfactorily dispose of the case on the second question we reserve consideration of the first until the case arises which requires it."

Although this eminent jurist was frequently confronted with this question it never received a solution at his hands.

In the case of *Interstate Commerce Commission* v. *The Railroad Company*, 57 Federal Reporter, 1005, this same jurist says at page 1011:

"The providing of a switch track depends on two things; first, the proximity of the consignee's store-house; and, second, business of a character to require or permit consignments in carload lots. The first of these conditions and perhaps second entitles the customer to a lawful discrimination in his favor. The favorable location of his store-house with respect to the track is an advantage which he may rightly improve,' and *it may be that* the wholesale character of his business is another element which *may* justify a discrimination in his favor over smaller shippers."

This jurist also approached the subject in the case of *Trust Company* v. *C. S. & H. Railroad Company*, 90 Federal Reporter, 148, in which he holds:

"Neither a railroad company nor its receiver, in the absence of an express contract, can be compelled to maintain and operate a switch or spur from its line for the use of private parties in the shipment of their products *at a loss, or when its operation can be rendered safe without a considerable expenditure of money.*"

From Elliott on Railroads, Section 1468, it is announced that where conditions and circumstances are identical a carrier must treat all shippers alike. It can not "furnish facilities to some and deny to others except upon circumstances and conditions which make the discrimination a just one."

A novel case of the application of equitable doctrine is found in the decision on October 15, 1903, by Goff, J., in the case of *Coal Company* v. *Railroad Company* in the United States Circuit

Court of West Virginia. In this case the discrimination consisted in the railway company furnishing to a certain coal company a larger per cent. of cars in proportion to its business than it did to the complaining company. In that case the court had a hearing on the evidence and finding that the rush of business did not permit the railroad company to furnish sufficient cars to all the coal companies on that line the court found the discrimination to exist and ordered that thereafter a certain per cent. only of its coal cars should be granted to the rival or favored company, and that a certain per cent. should be furnished to the other companies along the line including the complainant.

Another form of discrimination is presented in the case of *Menacho* v. *Ward,* 27 Federal Reporter, 529. In that case the defendant carrier attempted to justify the alleged discrimination on the ground that the favored shipper patronized it exclusively and that the complainant only occasionally. The court held that said facts did not justify discrimination and that therefore the common carrier could not charge a higher rate against an occasional shipper than it did for a patron who patronized the road exclusively.

I find one decision under the Interstate Commerce Act which is pertinent. Section three of the Interstate Commerce Act requires every common carrier subject to its provisions to afford all proper and equal facilities. This is probably only declaratory of the common law, and we may, therefore, consider a decision under this section as applicable independently of the statute itself. This case is the case of *Stock Yards Company* v. *Railroad Company,* 99 Federal Reporter, 472. In that case, Baker, J., holds that under that provision of the Interstate Commerce Act a common carrier of interstate freight can not lawfully deny switch connections or service to one person, place, locality or kind of traffic which it affords to others similarly situated. However, this decision does not stand uncontradicted, for Evans, J., in the case of *Stock Yards Company* v. *Railway Company,* 112 Federal Reporter, 823, doubts the correctness of the foregoing decision, and holds that the right of injunction was not available, but that the party complaining is limited to the remedies cited in the act, *i. e.,* damages, or an appeal to the commission for their order

and direction in the matter, and later on a suit in equity to enforce that order and ruling of the commissioners.

Certain apparent discriminations have long since been held not to be such. Thus in *People* v. *Railroad Company*, 104 New York, 58, the old doctrine is reaffirmed that at common law a carrier of passengers and freight is under no obligations to provide depots or warehouses; and this doctrine is laid down in *Railway Company* v. *Washington*, 142 U. S., 492.

In the case of *Vincent* v. *Railroad Company*, 49 Illinois, page 35, there is a dictum of the court at page 41, in the following words:

"A railroad company can unquestionably refuse to allow the owner of adjacent property to lay down a side-track connecting with its own rails."

It can readily be seen that this proposition of law is entitled to more than the force of mere dictum; it is sound on the face of it. A railroad company must determine its own policy. Its very existence depends upon the wisdom and discretion used in the policy to be pursued. Where, therefore, the railroad company itself has not declared a policy to pursue a certain line of business conduct it would be highly subversive of equitable power to attempt to substitute the judgment of the court or the judgment of every patron of the road for that of the directors. I think, therefore, that, generally speaking, a court of equity could no more compel a railroad company to lay down a side-track connecting with its own rails (in the absence of any other facts) than it could compel a railroad company to purchase and furnish a shipper with cars thirty feet high and one hundred feet long to accommodate a shipper demanding that size cars for his particular business. In other words in that case there is entire absence of allegation that the company had furnished switches to other persons similarly situated. The elements of discrimination and equal facilities therefore are not involved. But the foregoing case is the basis of another decision decided by the Supreme Court of Illinois in the case of *People* v. *Railroad Company*, 57 Ill., page 437. This was decided in 1870, and the same rule announced in Vincent case as a dictum of the court is now embodied as a syllabus as follows:

"By rules of the common law railroad companies can not be compelled to permit individuals to connect side-tracks other than with the tracks of the company, in order to enable the latter to carry grain to warehouses or elevators which have been erected off of their line of road."

By the second paragraph of the syllabus it would seem that the complainants had sought to compel such connection upon the ground of a custom, for that syllabus is as follows:

"And where it is sought to compel a railroad company to permit such connection, upon the ground of an alleged custom among the companies whose lines concentrate at the place indicated, the custom must be made clearly to appear, and to have existed so long as to have the force of law."

The element of discrimination is not passed upon by the court, at least not at all clearly, but it would seem that that court would have granted the remedy in case the plaintiff had established a custom of long standing. The petition itself in that case, among other things, did allege that a connection had been made to others, but the court denied the writ upon the grounds stated above. Within two years after this decision the people of the state of Illinois amended their Constitution, Article XI, Section 5, making track connection compulsory in all cases, thus disposing of the question in that state.

In considering this Illinois case I am constrained not to adopt the literal wording of the syllabus as the true doctrine of law, especially in view of all the decisions upon this subject in the third of a century which has elapsed since that decision was rendered. The same absence of any policy of the railroad establishing switches, and making discriminations, distinguishes the case of *Frostburg Mining Co.* v. *Railway Company,* 2 A. & E. R. R. Cases, 568, cited by counsel for defendant.

Still another case is cited by counsel for the defendant as conclusive here. That is the case of *Harp* v. *Railway Co.,* 118 Federal Reporter, 169. This case I am informed has recently been affirmed by the court of appeals. In that case Rogers, J., holds directly that:

"A railroad company is under no legal obligation to construct a spur-track from its line to a coal mine for the private benefit

of the owner in shipping his product; nor can it be held liable in damages for unlawful discrimination because of its refusal to build said track although it had permitted to be built and assisted in building similar tracks to other mines."

This was an action at law for damages for alleged discrimination. The decision comes from a charge of the court to the jury directing a verdict for the defendant and sustaining a motion for a non-suit. There were numerous matters of discrimination complained of, but a reading of the case can not possibly justify the broad contention of counsel for the defendant that it is conclusive of the case at bar. What the entire line of facts were does not appear, but from the instruction of the court to the jury it appears that in the fall and winter of 1900-1901 the business of the defendant railroad increased abnormally by reason of large crops and an immense development of coal and other products along its line, and that the defendant company notified the plaintiff that the loading of coal on its commercial tracks at Hartford could not be continued, and that the company could not receive or ship coal except by car loads. The undisputed evidence was that the demand for cars was greater than the supply and that the company had given orders for nearly one-third as many new coal cars as it then had in use, but they could not be had, "That to continue in loading cars by wagons on its commercial switches at Hartford was necessarily slow and therefore had a tendency to reduce the maximum shipping facilities of the road, and moreover delayed and interfered with its commercial traffic, and rendered dangerous the operation of the road to its employes," etc.

The court further says:

"It was conceded, and there seems to be no diversity of authority on the subject—both the decisions of the courts and the text-writers concurring—that the rule is that a common carrier, so far as concerns the receipt and transportation of goods, however it may be as to freight rates, must, where the conditions and circumstances are identical or substantially similar, treat all shippers alike. It can not furnish facilities to some shippers and deny them to others, unless there is a difference in the conditions and circumstances, such as makes the discrimination a just one. Public policy · forbids that carriers shall be permitted to favor one shipper, or one class of shippers and disregarding the general duty to accept and carry goods, to the prejudice of others."

Further on the court says:

"Nor has the coal operator any rights superior to the lumber dealer, the cotton speculator, the operators of the marble quarry, the agriculturists; the common law made none.    The statutes make none.    All are to be treated alike.    The answer to these questions, therefore, is that if the defendant company is engaged in carrying coal, or permitting it to be loaded in its yards in the manner stated, for one person, it can not lawfully deny it to another; but if it does not hold itself out as doing that kind of transportation, and is not in the habit of doing it for anybody, then no one has any right to complain."

Again, quoting from the court:

"It is only meant to say that where, by the charter, no such duties or obligations are imposed, railroads may determine for themselves what business they will engage in, what means and methods of transportation they will employ, what goods they will carry, and between what points and under what circumstances they will receive them, subject always to the principles of the common law already announced, so far as applicable to the point in hand, and also, within proper limits, to the police power of the state, from which power the state can not part, and may exercise at its will, within constitutional limitations.    Of course the general rules stated are the rules to be kept within the bounds of good faith and fair and reasonable conduct on the part of common carriers.    They may not arbitrarily, whimsically, or capriciously, and without reasonable grounds, deny transportation simply because they have it in their power to do so; neither could they, under like circumstances, make changes not in good faith as to what they will carry, where they will carry it to, or the means and methods to be employed; but to hold that, within the principles stated, they can not enlarge or curtain the class or kinds of articles they would carry, or determine the means and methods to be employed or to be held out to the public, would the conduct of its own business and subject it to its customers. be, in the absence of statutory regulation, to take from the carrier It must not be forgotten that the principles just stated are subject, always, to this principle: that what it does for one it must do for all under like circumstances.    Naturally all its interests will induce it to do all the business it can safely do, of all kinds, which afford it a just remuneration, so that its selfishness is at least the greatest security the customer has for getting his business done."

Further in the decision, at page 175, we find these words of the judge:

"I can not conclude otherwise than that the action of the defendant company in thus denying the loading of cars on its tracks in the yards was not only legal and reasonable, but manifestly in the interest of the safe, expeditious, and proper conduct of its business, and that in so doing there was no unjust discrimination against the plaintiff."

And further on page 177, the court says:

"I am of the opinion that there is no reasonable and fair view which can be taken on this case upon which any discrimination or preference, whether undue or reasonable or not, can be predicated."

And concluding the court says:

"And when it was not a common carrier of coal by such methods as plaintiff desired to employ, and was not furnishing cars or carrying coal for others in that way, nor holding itself out to do so."

Without taking too much time to quote from this case I will say upon one point only does the learned judge sustain the view which is contended for by the defendant in this case. It was evidently insisted by the plaintiff in his argument against non-suit, that because it discontinued the method of loading cars at the yard that the railroad company should thereupon have provided him with some other facility. In other words that the defendant company should have put in a spur-track for his benefit, under the same conditions that it had put in a track for others. The court, following the decision of the Supreme Court of the United States in the Nebraska cases, hereafter quoted, says that this would have been a violation of the Fourteenth Amendment of the Constitution of the United States. The syllabus therefore is not based upon a direct issue made in the case. It is strongly contended for the defendant here that to grant this writ would violate the Fourteenth Amendment to the Constitution of the United States. This contention is based on the Nebraska case.

The Supreme Court of the state of Nebraska issued an order of mandamus compelling the Missouri Pacific Railway Company to comply with an order of the Nebraska State Board of Transportation directing that company to grant to a private citizen the right and privilege of erecting an elevator upon the grounds

of the railway company at its station at Elmwood.  This order was made upon the ground that the railroad company had previously permitted two other favored persons to erect grain elevators upon their property at that station.  The case is reported in the 29th Nebraska, 550.  This case was then taken to the Supreme Court of the United States and reversed (*Railway Company* v. *Nebraska*, 164 U. S., 403).  In overruling the decision of the Supreme Court of Nebraska in that case, the Supreme Court of the United States, through Mr. Justice Gray, after stating that the record fails to show what the terms and conditions were of the contract between the railroad company and the owners of the other two elevators, etc., uses this guarded language:

"This court confining itself to what is necessary for the decision of the case before it, is unanimously of opinion that the order in question, so far as it required the railroad corporation *to surrender a part of its land* to the petitioners, *for the purpose of building and maintaining their elevator upon it,* was, in essence and effect, a taking of private property of the railroad corporation for the private use of the petitioners."

This being a violation of the Fouteenth Amendment to the Constitution of the United States the judgment was reversed.  And it is upon this decision that the learned judge in the Harp case, quoted above, bases his conclusion that in effect to compel a railroad company to use its money and lay down a track to a private shipper would be taking private property in violation of said article of the Constitution.  Does the case at bar fall within that provision of the Constitution of the United States?  Is it the taking of private property to compel a railroad company to perform its duty exclusively as a shipper?  In the Nebraska case the actual real estate of the railroad company was sought to be appropriated for the purpose of erecting a private building, which said building was to be used as a warehouse.  In the case at bar the property of the railway company is sought to be used solely and exclusively for the purposes for which said company is formed, to-wit, the shipment of freight.  In a sense, perhaps, it might be said to be the taking of the railroad company's property, but not in the sense which is involved in the Nebraska case.  It is more akin to the case of one who drives up to the railroad company, and by the aid of the court compels that com-

pany to furnish him a car and permit him to load on that car his freight, as a shipper. In other words, I am of opinion that a connection such as is desired by the plaintiff in this case is in the nature of a mere shipping facility, and as to all such a common carrier by its very nature is bound to furnish, and is not protected by any such construction of the Fourteenth Amendment to the Constitution. I do not consider that a track connection made at the expense of plaintiff would be as much the taking of property as would be the compelling of a railroad company to furnish its expensive modern machinery for emptying cars at the dock or to furnish cars themselves, as has been quoted above. And on this ground I do not feel warranted in following the decision in the Harp case. It is significant that the provisions of the constitutions and statutes of several states requiring a railroad company to furnish track connections, irrespective of any discrimination, have not been questioned under this doctrine.

It is urged, however, against this proposed remedy that the court will be substituting its policy for that of the directors of the railroad company. But it has been held in the case of *Railroad Commissioners* v. *Railroad Company*, 63 Maine, 269, that:

"It is not within the discretion of the directors of a railroad company ultimately and conclusively to determine the manner in which the corporation shall discharge the public duties enjoined upon it by its charter; that power and duty are devolved upon the state tribunals."

I should not desire to announce a doctrine quite as strong as the foregoing. And as I have said before if the railroad company itself had not outlined its own policy as to the manner in which it would conduct its business, this court would certainly not be justified in forming a policy for them. But under the facts admitted by the demurrer the railroad company has already announced its policy, and having done so it is the duty of the court to see that it extends that policy equally to all, and without discrimination to any. In other words, this court would never say to a railroad company, we think it your duty now to give switches to private individuals for the better accommodation and more advantageous handling of their coal product. But if the company itself adopts that policy, and as one of the means for handling coal provides switch connections in order that the coal

may be loaded directly into cars, a court might be well justified in saying that those facilities must not be used to discriminate in favor of one and against another.

As announced in *Stock Yards Company* v. *Railway Company,* 67 Federal Reports, 35:

"The rule that a court of equity will not make an order requiring it to supervise the details of business transactions is one, the application of which rests very largely in the sound, legal discretion of the court, but will not prevent the court in a proper case from requiring a defendant to furnish facilities for the loading and unloading of live stock."

It has been argued by the defendant that this coal company could haul its coal to the nearest station where the company has already provided side-tracks and there load its coal. If the policy of discrimination, which the petition alleges to exist here, were carried to its extreme limit, I know of no reason which would prevent the defendant from abolishing any such station in case the plaintiff should desire to avail itself of that expensive method of transportation, because the company has the right to abolish or to refuse to establish stations.

It is likewise argued with much force that if this court should announce the doctrine such as is contended for, the railroad company might be compelled to put in a switch every one thousand feet or every one hundred feet, which would practically ruin the railroad company and its business, and compel it to cease business. What the practical operation and policy of the railroad company must be with reference to all such questions is not a matter for this court, but a matter for the directors of the raiload company itself. We might just as well ask the railroad company what it would do if ten times the amount of freight which it is able to handle would be presented to it each day for the next year. The answer would be that the railroad company would devise some plan of policy to meet or offset the situation to be presented. While it is not the province of the court to suggest the business policy or plan or procedure in such cases, it is easy to conceive that should a line of coal operators at every one hundred or every one thousand feet along the road demand a switch the railroad company could require that they build one continuous track along through the various properties and make but one cut on the main track. All such questions

of policy are exclusively in the hands of the railroad company, and the plaintiff before it could have any such remedy would be bound to comply with all the requirements of the defendant company in that behalf. This question seems to have been met without difficulty in those states where track connections are by law given, irrespective of the policy of the road.

The defendant has also urged that certain allegations are not made. For instance it is not alleged that the connections demanded by the plaintiff could be operated by the railroad company without loss or that it could be operated at a profit. These absent, negative averments I do not consider as necessary to the petition, but are proper matters for the answer. It is not within the province of the plaintiff to negative every possible regulation which the defendant company might wish to propose with reference to a switch connection. Nor does this court concede that the overruling of this demurrer would seem that every person demanding a switch connection of whatever character, of whatever nature of the shipment should be entitled to it. It is the duty and the privilege of the railroad company in establishing its doctrine and policy in regard to switches to make such reasonable regulations, and to make such changes as will fully protect it from all danger and properly compensate it for all its service. It is not unreasonable to believe that this can and will be done. It is done in those states where by statute and by constitutional enactment a railroad company is compelled to grant a switch. And although the Illinois constitutional provision in this behalf has been in existence for thirty years no railroad company has yet established it to be in contravention of the Fourteenth Amendment of the Constitution of the United States.

There are many other objections urged by the defendant of a practical nature against the granting of any switch connections, but I consider all of this proper by way of answer.

The argument that because the remedy and relief sought are without precedent, or that no similar case can be cited as having been decided hitherto, can not be given great weight in this case. True it is that in lines of precedents and upon fixed principles lies much of the strength of the common law. But it is equally true that with its expansive character it applies those fixed principles to meet the ever changing needs of man. With justly mer-

ited conservatism, it nevertheless follows closely the changes and advancements in commerce and conditions of society, and adequately meets the exigencies of each change.

The relief granted in a case of this kind is not limited to those reasons on which private rights are enforced. The far deeper principles involved are the interests of the public, fixed and determined by settled law, that it must be fairly dealt with by the common carrier, and that equal facilities be furnished to all.

To award damages successively and by indeterminate suits to the plaintiff, might compensate him; but the unlawful restraint of trade, and the vice complained of—indeed the very things which upon grounds of public policy and public necessity the well settled law so clearly forbids—all continue unrestrained. A system of jurisprudence confesses itself inadequate which refuses the relief sought, under such circumstances as here presented. Therefore, just as in former times, the common law demanded personal delivery to the consignee of all freight carried by a common carrier by land, and as that same law later relaxed the rule through necessity, as the character and quality of freight changed, so now we have seen the growth of coal shipments from small loads and cumbersome transfers to the instantaneous loading of entire cars; and since it is inconvenient to allow such cars to remain standing and be so loaded on the main track, the defendant provides a track at the side for that purpose, on which they may stand until convenient for shipment; and this method being facility of great advantage for receiving and carrying freight, shall not the law recognize it as such, and apply its fixed principle.

The courts will jealously guard and protect the property rights of a public service corporation; indeed, at times of perferted public sentiment or erratic and hasty legislation, the courts are the only bulwarks of safety for them; but I do not consider that the enforcement of this ancient principle is a violation of those rights.

The demurrer is overruled.

*Kline, Carr, Tolles & Goff* and *Arnold, Morton & Irvine*, for plaintiff.

*Hoyt, Dustin & Kelley, Doyle & Lewis* and *C. C. Hunter*, for defendant.