## COMMONWEALTH *vs.* FITCHBURG RAILROAD COMPANY.

A railroad corporation, which has built a branch railroad under authority from the legislature, maintains it in good condition for use, uses it regularly and sufficiently for the transportation of freight, and is ready at all times to transport passengers and draw passenger cars over it whenever any shall be offered to be transported or drawn for a reasonable toll or compensation, does not forfeit its franchise by discontinuing, after public notice, the running of regular passenger trains over the branch railroad, when there is not sufficient passenger business at any rate of toll or fare to pay the expenses of running them, by reason of the establishment under authority of the legislature of a competing line for the transportation of passengers over a horse railroad.

INFORMATION filed by the attorney general at March term 1858 against the Fitchburg Railroad Company, alleging that they were a corporation duly established by *St.* 1842, *c.* 84, and had a usual place of business at Boston, and by § 2 of that statute, and the *Sts.* of 1846, *c.* 261 · 1847, *c.* 223; 1848, *c.* 160;

1849, *cc.* 73, 223; and 1851, *c.* 72, were empowered to purchase, construct and maintain, and did purchase and construct the Charlestown Branch Railroad, the Watertown Branch Railroad and the Waltham and Watertown Railroad, and for a long time maintained them as railroads for the transportation of passengers and freight, and purchased, held and enjoyed the franchises, rights and privileges conferred by those statutes, and by reason of the premises became and were fully authorized and empowered and by law required to maintain these connecting lines of railroad for the transportation of persons and property between a point on their main railroad near Fresh Pond through Watertown to Waltham, and over the same to carry and transport, at all reasonable and convenient times and seasons, all such persons as should from time to time offer themselves to be so carried and transported, for a reasonable toll or compensation, to be demanded and received of them by the defendants; yet the defendants had not since the 1st of June 1857 maintained these three lines of railroad for the transportation of persons over the same, but had wholly refused and neglected to carry and transport any persons thereon, notwithstanding that divers persons had from time to time offered themselves and requested to be so carried and transported, and had been ever ready to pay the defendants such toll or compensation therefor as might be reasonably and lawfully demanded by them; to the great damage of the Commonwealth. The prayer of the information was for the advice of this court in the premises, and for due process of law against the defendants to make them answer, and show cause why the rights, privileges, franchises and liberties given and granted to them in and by the said statutes should not be adjudged to be forfeited, by reason of the misfeasance, neglect and refusal aforesaid; and also answer by what warrant they claimed to have, use and enjoy these rights, privileges, franchises and liberties, they having forfeited the same by reason of this misfeasance, refusal and neglect.

The defendants in their answer admitted their incorporation, and that by the said and other statutes they were entitled to hold and enjoy all the franchises, rights and privileges by said

statutes created and conferred; but denied that the nature and extent of those franchises, rights and privileges and of the obligations and duties thereon arising were correctly set forth in the information. They further admitted that they had purchased, located, constructed and maintained the several railroads in the information named, as therein alleged, and averred that they had ever since maintained those railroads and had done and performed all the acts, matters and things by law required of them under and by virtue of the statutes aforesaid; and had exercised, kept, preserved and maintained inviolate all their franchises, rights, privileges and liberties. They denied that those statutes imposed upon them any such obligation to carry and transport passengers over the branch railroads as the information alleged, or that any persons had since the 1st of June 1857 offered themselves or requested to be so carried and transported, or that they had neglected or refused to carry any person so offering himself; but averred that they had always maintained said railroads and sections of railroad as a railroad, and in proper condition and repair, and suitable and in readiness for the transportation of freight and passengers, and had regularly and at reasonable and convenient times transported over the same, for a reasonable compensation or toll, large quantities of freight, and all the freight that had been offered to be transported; and had been always ready and willing to transport at all reasonable and convenient times all passengers and passenger cars which might or should be offered for transportation over the said railroads or sections of railroad, or desiring to be transported over the same, at and for a reasonable compensation and toll. But they admitted that since the 1st of June 1857 they had not run from Fresh Pond to Waltham any regular trains of cars for the transportation of passengers, and alleged that they had given notice that no such trains would be run; and that before that day it had been ascertained and determined, by long and careful experiment, that all the compensation and toll which could be obtained, received or demanded, from passengers carried and transported or desiring to be carried and transported, on such or any regular trains upon said railroads or sections of

Commonwealth v. Fitchburg Railroad Company.

railroad, would not be and were not sufficient to pay the expenses of running such trains, without allowing any sum for profit upon the capital in the same, of for the use of such capital, and for the use and repair of the necessary engines and cars ; and they denied that there was any law of the Commonwealth, or that they possessed any franchise, which required them to run any trains of cars for the transportation of passengers, or to carry or transport any passengers or persons, over their railroad or any part thereof, except for a compensation or toll sufficient to pay the expense of such transportation and to pay a reasonable profit for the use of said road and for the use of the necessary engines and cars for such transportation and for the use of the capital necessarily employed therein. They further answered that they always had been and were ready for a suitable and reasonable compensation or toll, upon a special agreement in each case to be made, at reasonable and convenient times to transport and convey over all parts of their railroad all persons, passengers and passenger cars, which might be at any time offered and ready to be transported or carried ; and that since their acceptance of the several statutes in the information named, and since the construction of all the railroads and sections of railroad aforesaid, the legislature had chartered and authorized and procured the construction of a horse railroad from Watertown to Boston, by which so much of the travel of passengers has been diverted from the defendants' railroads that the defendants' franchises had been much impaired in value, and it had been made impossible to run cars for the transportation of passengers over the parts of railroad upon which regular passenger trains had been discontinued, at any rate of toll or compensation which would pay the expense of running the same, or afford any reasonable profit or return for the use of said railroads or of the capital invested therein.

To this answer the attorney general demurred generally, and the defendants joined in demurrer.

*S. H. Phillips*, (Attorney General,) for the Commonwealth. The defendants, having built their railroad and branches, and having for a time maintained the same by running regular pas-

senger and freight trains, are bound by law to continue to run passenger trains at stated times and with reasonable frequency over the main road and all the branches, until authorized by the legislature to discontinue the same. Wherever a power is granted by the legislature to do an act, in the execution whereof the public have an interest, the power, if accepted, implies or creates an obligation, although granted by permissive words only ; the more especially where the power granted includes the exercise of some of the attributes of sovereignty, as the power of taking private property for a public use. Com. Dig. Parliament R. 22. *London* v. *Vanacre,* 12 Mod. 271. *Blakemore* v. *Glamorganshire Canal,* 1 Myl. & K. 162. *The Queen* v. *Eastern Counties Railway,* 10 Ad. & El. 546. *Mason* v. *Fearson,* 9 How. 259. *Ward* v. *Sea Ins. Co.* 7 Paige, 294. *Newburgh Turnpike* v. *Miller,* 5 Johns. Ch. 113. *In re Jackson Marine Ins. Co.* 4 Sandf. Ch. 564. *Boston & Lowell Railroad* v. *Salem & Lowell Railroad,* 2 Gray, 33. For the same reason, it would seem that the legislative grant is conclusive evidence as well of the duration, as of the existence, of the public exigency ; for the legislature cannot authorize the taking of private property for an unlimited time for a temporary public use. The grant to the defendants is unlimited as to time.

These defendants, and they alone, are authorized to execute this power, and to " maintain " these roads, and run trains upon them. *Thomas* v. *Boston & Providence Railroad,* 10 Met. 477. *Norway Plains Co.* v. *Boston & Maine Railroad,* 1 Gray, 269. *Commonwealth* v. *Wilkinson,* 16 Pick. 177. *Roxbury* v. *Boston & Providence Railroad,* 6 Cush. 429. *Worcester* v. *Western Railroad,* 4 Met. 566. *Bloodgood* v. *Mohawk & Hudson Railroad,* 18 Wend. 23. *Beekman* v. *Schenectady & Saratoga Railroad,* 3 Paige 74. *Sts.* 1838, *c.* 99 ; 1845, *c.* 191 ; 1849, *c.* 191, § 2.

The defendants being made a corporation, with certain powers and rights to the prejudice of private rights, not for their own sake, but for the public good, their corporate existence, rights and powers must be subordinate to the rights of the public, and they must be deemed trustees holding these rights and powers

primarily for the furtherance of that special public purpose for
which alone they could lawfully be granted ; and secondly, by
way of compensation for their own benefit.    Upon the con-
struction of their privileges claimed by the defendants, the
public right, which is conclusively shown to exist, is wholly
without remedy, and cannot be enforced ; and whether or not
the public shall have that benefit which they are conclusively
shown to need, and for securing which they have interfered with
private rights, is made to depend wholly on the will and pleas-
ure of a body created by the public for the very purpose of
securing that benefit.    It may well be doubted whether such an
arrangement, if made by the express terms of a statute, would
be constitutional.    *Worcester* v. *Western Railroad,* 4 Met. 565.
*Erie & Northeast Railroad* v. *Casey,* 26 Penn. State R. 308.
*Boston Glass Manuf. Co.* v. *Langdon,* 24 Pick. 53.    *In re Jack-
son Marine Ins. Co.* 4 Sandf. Ch. 564.

The defendants have by their own acts given to the word
" maintain " the construction contended for, by running regular
passenger trains over the parts of their road in question.    More-
over, if the acceptance of their charter did not create an obliga-
tion to build and maintain the road, the partial performance of
their powers has created the obligation, for they have taken pri-
vate property, and have created what, but for their justification
under their charter, would be nuisances.

The English cases are not in point, because an act of parlia-
ment (which is omnipotent) authorizing the taking of private
property is not conclusive evidence of a public exigency requir-
ing the use authorized, and because the express language of the
decisions warrants a different result in the case of a part per-
formance.    *The Queen* v. *York & North Midland Railway,* 1 El.
& Bl. 178, 858.    *The Queen* v. *Lancashire & Yorkshire Railway,*
1 El. & Bl. 228.    *The Queen* v. *Great Western Railway,* 1 El.
& Bl. 253, 874.

The defendants, having failed to perform one material cor-
porate duty, have forfeited all their corporate rights.    *People* v.
*Bristol & Rensselaerville Turnpike,* 23 Wend. 233.    *Common-
wealth* v. *Hancock Free Bridge,* 2 Gray, 64.    *Commonwealth* v

*Tenth Massachusetts Turnpike*, 11 Cush. 177.   Angell & Ames on Corp. § 776.

*E. R. Hoar*, for the defendants, in addition to the statutes and authorities already cited, and to those referred to in the opinion, cited *Sts.* 1836, *c.* 187; 1837, *c.* 94; 1839, *c.* 126; 1841, *c.* 108; 1844, *c.* 176; 1846, *c.* 21; Rev. Sts. *c.* 26; *c.* 39, § 83; *The King* v. *Birmingham Canal*, 2 W. Bl. 708; *The King* v. *Severn & Wye River Co.* 2 B. & Ald. 646; Redfield on Railways, 456 & cases cited.

THOMAS, J.   The principles involved in the discussion and decision of this case are of great public interest, but the question arising on the answer and demurrer is narrowed to a single point.

The demurrer to the answer admits in substance that the respondents have built and maintained in good condition for use the Watertown Branch Railroad and the Waltham and Watertown Branch Railroad; that they have been used for the transportation of freight so as to meet the public wants and demands, that the respondents have been ready to carry any passengers and draw any passenger cars, for a reasonable toll or compensation, that should be offered; that none have been offered which they have not transported; that there is not sufficient business to pay the expenses of running regular passenger trains; that the want of passenger business has been caused by the establishing, under the authority of the legislature, of a competing line for the transportation of passengers over a horse railroad; and that for these reasons the respondents discontinued the running of regular trains over the branches, and gave public notice of this discontinuance.   The giving of this notice led to the filing of this information.

The position taken by the Commonwealth is, that it was the duty of the corporation to run regular trains for the carriage of passengers upon the branch roads; that the facts stated in the answer and admitted by the demurrer constitute in law no excuse for not so doing; and that the omission and neglect to run regular trains for the carriage of passengers was a breach of public duty, involving the forfeiture of the franchises of the corporation

The precise question therefore before us is, whether the running of regular passenger trains was, under the facts admitted by the demurrer, a legal duty ?

Neither the statutes under which the respondents hold their franchises, nor the general laws regulating railroad companies, in terms impose upon the respondents such duty.

The railroad contemplated by our earliest legislation upon the subject was but an iron turnpike, the use of which was to be paid for by tolls collected of persons travelling upon it. It apparently was not anticipated that the railroad companies were to become themselves the carriers of goods and passengers. *Sts.* 1829, *cc.* 26, 93 ; 1830, *c.* 4 ; 1831, *c.* 56. *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 28.

But this idea or policy as to the mode in which railroads were to be used was abandoned before any of our railroads were fully constructed and put into operation. In the act incorporating the Boston and Worcester Railroad Company, (*St.* 1831, *c.* 72,) powers were given to the corporation for the transportation of persons and goods, and for the purchase of engines and cars for the purpose. These provisions were inserted, it is understood, under the advice of a distinguished member of our profession deeply interested in works of internal improvement. All the subsequent legislation of the Commonwealth has assumed and proceeded upon the ground that railroad companies were to be the carriers of passengers and merchandise upon their respective roads. The *St.* of 1849, *c.* 191, settled the matter in terms, by providing that no locomotive engine or motive power should be allowed to run upon any railroad constructed under the authority of the Commonwealth, except such as belonged to and were controlled by the corporation owning and managing the road, unless by the consent of the corporation.

There can now therefore be no doubt that the running of trains for the carriage of passengers and freight is among the franchises of railroad corporations. In two instances, and it is believed in two only, has the legislature in terms imposed upon

railroad companies the duty of running passenger and freight trains. *Sts.* 1852, *c.* 305 ; 1857, *c.* 263.

We can have no doubt that the conferring upon the railroad corporations of the power of carrying freight and passengers has imposed upon them to some extent the correlative duty of carrying them at reasonable times and for a reasonable compensation, subject to the revision of the legislature. This conclusion is confirmed, if any confirmation were necessary, by the policy adopted by the legislature in the *St.* of 1849, *c.* 191, and since frequently affirmed, of excluding from the railroad any other motive power than that of the corporation owning the road.

The construction of a railroad is not a private enterprise. The corporation exercises the right, or the legislature through the corporation exercises the right, to take private property for the road, on the ground that the use is a public use and the road itself a highway for the public travel. On no other ground could the exercise of the right of eminent domain by or through these corporations be upheld. The legislature has in this view and to this end reserved to itself full power to amend or alter the charters of the railroad companies and regulate the exercise of powers under them.

The question therefore is not as to the existence of the duty, but as to its extent and qualifications.

Upon a line of railroad of much travel, and where the public convenience required frequent trains for the carriage of goods, a corporation would not discharge its duty by furnishing trains wholly inadequate to meet the public wants; much less if it wholly neglected or failed to make any provision whatever to meet the public wants. We are not prepared to say that such neglect and failure would not be deemed such a dereliction of legal duty on the part of the corporation as to involve the loss of its franchises.

But it is plain that the power to judge of what is necessary or reasonable in the premises is, except in those cases where the legislature has expressly intervened, in the first instance in the corporation. It is clear also that the duty required is not more

than to meet and supply the public wants. These are measured by the business actually done, or what could be clearly shown would be done if increased facilities were granted. There is nothing in the language of the statutes requiring, nor can any just implication from the powers and privileges conferred upon the corporation require, that trains for passengers or freight should be provided, which are not wanted, or which the business upon the road would utterly fail to support. Yet such is in substance the claim made by the Commonwealth through the attorney general. It is contended that the duty is not relative, but absolute; that it is not to be measured by the public wants and exigencies at the time, but is to be performed at all hazards, or at any sacrifice, unless or until the legislature shall interpose to relieve the corporation from its performance. This position cannot be sustained. If it had been intended that the duty of running trains should be absolute, it would have been made definite. But the question at once arises, When and how often is this duty to be discharged? Is a train to be run whenever a passenger shall desire to go; or are there to be fixed times, and, if so, how frequent? To settle these questions, you would have to refer to the public wants, and these could be measured only by the business done. If trains run at reasonable and moderate fares cannot be supported, it is because they are not needed.

If the duty is to be held absolute, how long, for what period of time, is it to be performed? Is it during the lifetime of the charter, and this though the expense of running the train is daily and rapidly using up the capital stock of the company? If so, when the capital stock is exhausted, is the corporation to provide new resources for the purpose; and if so, what power is given to it under the laws for that purpose?

Again; it is to be considered that the respondent corporation has under its charter other roads to maintain, and other duties to the public to discharge, and the running of passenger trains on these branches might exhaust its resources and render it incapable of discharging these other duties. It would seem to be therefore not only its right but its duty to exercise a sound

discretion in the use of its capital, lest by exhausting it upon trains that were not required by the public wants, it should deprive itself of the means of running at reasonable rates those that were.

The point is made in the argument for the Commonwealth, that because the respondents have for a time maintained the roads in running regular trains for freight and passengers, they are bound to continue to run until authorized by the legislature to stop. We cannot see that a beginning to run these trains rendered their continuance, at whatever cost or sacrifice, a legal duty. It might be more plausibly said that it was the duty of the corporation, after a road was built, to make the trial of running regular trains for passengers and freight; that they were not to presume beforehand that the business would be inadequate; that it was difficult to foresee or anticipate all the business which would find its way to the road, and therefore the experiment should be fairly made. But when trial had been fairly made and had proved disastrous, the duty would have been discharged.

Upon the facts stated in the answer and admitted by the demurrer, we are all of opinion that the demurrer must be overruled and the information dismissed.     *Information dismissed.*