HERBERT T. B. JACQUELIN et al.

*v.*

THE ERIE RAILROAD COMPANY.

[Filed May 8th, 1905.]

1. The right, if any, which a private individual has acquired by implied contract or otherwise, to compel a railroad company to maintain a station at a certain point will not be enforced by injunction restraining the discontinuance of the station, but the party will be remitted to a suit for damages.

2. The right, if any, of the public to compel a railroad to maintain a station at a certain point is a legal one, enforceable by *mandamus*, and not by injunction to prevent the discontinuance of the station.

3. An injunction to prevent the discontinuance of a railroad station is so far mandatory that it should not issue preliminarily except under such circumstances as justify the issuance of a mandatory injunction.

4. The authority of the courts to compel a railroad company to maintain a station where not required by charter or statute is not so clear as to justify the granting of a preliminary injunction restraining the discontinuance of such a station.

5. *Mandamus* to compel a railroad company to maintain a station at a certain point is an adequate remedy where the company threatens to discontinue the station, and a preliminary injunction will not issue to keep the matter in *statu quo* pending the determination of the *mandamus* proceeding.

On motion for preliminary injunction. Heard on bill and affidavits and answering affidavits.

The bill in this suit was filed on the 30th of March, 1905. In it the complainant Jacquelin sets out that, beginning with the year 1903, he has invested in property, in what is now the borough of Orvil, an aggregate of $40,000; that the borough of Orvil was formed during the month of March, 1905; that the purpose of the complainant Jacquelin in buying the property aforesaid was to make for himself a permanent residence, and that he has many acquaintances who have indicated their inten-

tion of purchasing property in the said borough and becoming citizens thereof, and that one of the inducing reasons is its proximity to the cities of New York and Brooklyn, and the railroad communication between it and those places; that the station used by the inhabitants of said borough is Hohokus, on the main line of the Erie railroad, about twenty-four miles from New York, which station has been in permanent use for about sixty years, and at which station there is passenger, freight and express service; that said Hohokus is the only railroad station within the limits of the borough of Orvil; that the nearest stations thereto are at Undercliff, which, by road or street, is about four-fifths of a mile distant from Hohokus, and Waldwick, which is similarly distant one and a half miles therefrom; that the complainant Jacquelin has large quantities of freight, consisting of coal, fertilizers, feed and the like, delivered to his residence from New York and other places, which can be easily obtained by him from the station at Hohokus, and cannot be obtained, without the use of poor roads and bad facilities, at Waldwick, while at Undercliff there is no freight station, and, on account of the topography of the ground, no likelihood of there being one; that the defendant company posted a notice in its railroad station at Hohokus to the effect that on and after April 1st, 1905, said station and train service and freight facilities thereat would be discontinued.

It is also stated that the assessed valuation of the borough of Orvil is about $220,000, and it is charged that if the station is discontinued, the value of the land within the borough will be greatly decreased. It is charged that the withdrawal of the freight and passenger service at the station at Hohokus will be an irreparable injury to complainant Jacquelin, and to the others who use said station.

The prayer of the bill is that a permanent injunction be issued restraining the Erie Railroad Company from discontinuing the use of the said Hohokus station, and discontinuing the train and freight service as now existing thereat, or as may hereafter be regulated by the said Erie Railroad Company, and requiring the company to maintain a station at Hohokus where

said station is now located, and to continue the stopping of a reasonable number of trains daily thereat, and the maintenance of a freight service of the same character as is now maintained at said point, together with a prayer for a preliminary injunction along the same lines.

Upon the filing of this bill and affidavits, an order to show cause was made, with *ad interim* restraint against discontinuing the train service until the further order of the court.

Subsequently other parties were admitted with the complainant Jacquelin as parties complainant, among them the borough of Orvil, the New Jersey Agricultural and Driving Association, the Brookdale Bleachery, Isaac E. Hutton, Edwin West, Jr.; Mary E. Staples, Rebecca W. Hawes, Elizabeth M. Blauvelt, Harold R. Miller and Joel E. Miller.

The general situation of each of these complainants, excepting the borough, is that of one who has invested money at or near the Hohokus station, either in business or in residence property, and that this was done in reliance upon the belief that the Erie Railroad Company would continue the station where it now is, and that it will be an irreparable injury if the same is removed.

The defendants did not file an answer upon the return of the order to show cause, but did file affidavits. In these affidavits they set up that when the station at Hohokus was established there had been little or no development of the region through which the railroad ran; that no settlement grew up around the station, and the small population served by it extends, generally speaking, north and south along the turnpike road which runs parallel with the railroad some distance to the east of it; that there is no one, excepting the Brookdale Bleachery, on the west side of the railroad at this point; that to the south, in extension of the town of Ridgewood, a large population has gathered, and a station called Undercliff was established about fifteen years ago; that to the north a still larger population has gathered, leading to the establishment, about the same time, of a station called Waldwick; that the passenger service at Undercliff and Waldwick has constantly increased, while that of Hohokus has been at a standstill.

Relative figures are given with respect to the sale of commutation tickets at the three stations which show that at Hohokus the greatest number sold during any one month, from December to March, 1905, was eighteen, as against fifty-four at Undercliff and fifty-five at Waldwick, and that the least number was four at Hohokus as against forty-six at Undercliff and fifty-three at Waldwick.

The amount of passenger receipts to and from the three stations for the fiscal year ending June 30th, 1904, is given, which shows that at Hohokus these were $2,583.30; at Undercliff, $7,001.16, and at Waldwick, $9,123.74.

The answering affidavits further set up that the hotel, post-office and stores along the turnpike road are nearer to the Undercliff station than to the Hohokus station; that the main freight service at Hohokus is for the Brookdale Bleachery, which has a private siding for carload freight, and that there is good freight service at Waldwick, where the company maintains a freight-yard; that the reason the company determined to discontinue the passenger station at Hohokus was because it was annoying to through passengers to maintain two stations as near together as Undercliff and Hohokus, and upon the score of economy it was determined, since Undercliff was the more important for passenger service and Waldwick for freight service, to discontinue the Hohokus station, making reasonable arrangements for the accommodation of the traffic.

It is also shown that an arrangement was offered the Brookdale Bleachery and the other business men mentioned in the bill with respect to handling their freight, and that the amount of freight handled for the complainant Jacquelin was trifling.

There are other allegations in the affidavits which it is not necessary now to detail.

*Mr. Cornelius Doremus* and *Mr. Charles D. Thompson,* for the complainants.

*Messrs. Collins & Corbin,* for the defendant.

GARRISON, V. C.

The precise question which is raised upon this motion is whether a court of equity in New Jersey should grant a preliminary injunction requiring a railroad company to continue to furnish railroad facilities at a station which the company desires to abandon, there being no charter or statutory requirement with respect thereto.

There is no provision in the charter under which the defendant company is operating this part of its road which makes it a duty of the company to establish or maintain this or any other station.

My attention has not been directed to any provision of our statutory law which in any way declares or defines the duties of railroad companies with respect to the establishment or maintenance of stations.

I do not use the word "station" in its narrower meaning, or a building or place prepared for the reception and discharge of passengers and freight, but I am using the word to include a place at which the company habitually stops its trains.

If it is held to be the duty of a railroad company to continue to maintain railroad facilities at a station, it must be a common law duty.

The right which the complainants seek to have enforced against the defendant in this case must correspond with what is found to be the duty of the defendant. The right, therefore, is purely legal.

Of course, if the complainants' rights were primarily equitable and not legal, entirely different principles would be applicable.

The complainants, for the purpose of inducing the court to grant this motion, insisted that they were entitled to the relief upon either one of two theories, i. e., that they had a legal right which, under the circumstances, the court of equity would protect, or that they had an equitable right which the court would enforce. They sought to make out this equitable right by claiming that the company, by its conduct in locating a station at the point in question, had induced people to come there and settle, and, by its time-tables and advertising matter, had indicated

that this station was one of its regular stopping places at which the public would continue to be served, and that it would be inequitable to permit the company to discontinue service at this place.

It seems to me, however, with respect to the claim that, by establishing the station and inducing people to come there, rights arose against the company, and a duty was enjoined upon the company, that such right, if it exists, and such duty, if it has been imposed, is the legal right or the legal duty. In other words, if common carriers, under obligation to serve the public, so conduct themselves as to give rise to rights in the public with respect to the operation of the road, such rights are public, and are not with respect to the particular individual or individuals who are affected more nearly than others of the public by a default upon the part of the company.

To hold that there is an implied contract—for that is what it amounts to—between a common carrier and each person who lives along the line of the road, or who uses the road for purposes of transportation, would be, I think, an entirely defenseless judgment.

If, however, it should be held that the railroad, by its conduct toward one or many individuals, had obligated itself by implied contract to continue a service at a particular place, I do not think a court of equity should enforce specifically such implied contract in all cases, if at all.

In cases where a railroad, by positive agreement, engaged to establish and maintain a station, the courts have refused to give effect to such agreement by specifically enforcing it, for the reason that such agreement is against public policy, and even where it will not be disregarded for that reason, it is better to permit the railroad to serve the public unfettered by hampering contracts and to leave the injured party to his suit for damages for what he may have suffered by reason of the breach on the part of the railroad. *Florida Central, &c., Co.* v. *Florida, 20 L. R. A. 419; Conger* v. *Railroad Co., 120 N. Y. 29; 23 N. E. 983; Texas and Pacific Railway Co.* v. *Marshall, 136 U. S. 393; 34 L. Ed. 385; Texas and Pacific Railway Co.* v. *Scott, 41 U. S. App. 624; 37 L. R. A. 94; Mobile and Ohio Railroad Co.*

v. *People, 132 Ill. 559; 24 N. E. Rep. 643; 22 Am. St. Rep. 556.*

To the extent, therefore, that the rights of individual complainants are not part of and are not merged into the public right, but are peculiar to each of said complainants, this court, upon the facts in this case, would not feel justified in granting the relief asked for.

But, in my view, the right which these complainants are seeking to have enforced against the defendant is, as I have heretofore said, legal and not equitable.

By reason of my conclusions in this case, I have not considered and do not decide whether these complainants are the proper persons to seek the enforcement of the public right in the premises. I have not, therefore, considered whether the attorney-general, on behalf of the people of the state, is the necessary party complainant to enforce the right of the complainants and the duty of the defendant.

The form in which the complainants ask for relief is phrased as if to restrain by prevention, but in effect it is to compel performance. The railroad company having given notice that it intended to discontinue the station, the complainants ask that it be compelled to continue its service at the station.

While there may be some doubt as to whether an injunction to prevent the discontinuance of an existing service is mandatory or not (*Ex parte Lennon, 166 U. S. 548; 41 L. Ed. 1110*), I think it so far partakes of the nature of a mandatory injunction that it should not issue preliminarily except under such circumstances as our courts have approved with respect to mandatory injunctions.

The case is one of great importance in respect to the principles involved. While in this particular case the number of persons affected is not very large, and the amount of property at and near the station in question is not great, it will be readily perceived that the principles which are held to be applicable to this case will apply equally to cases in which a vast number of persons is affected and property interests of great magnitude are involved.

The whole subject-matter of the relationship of these com-

mon carriers to the public, and of what the duties of such carriers are, and whether they must be defined by the legislature or may be inferred by the courts, is of great and growing importance.

Some of the most important of these questions are:

1. How far the legislature has committed to the discretion of the directors of these companies the determination of the kind, quality and amount of service that they will render to the public.

2. How far the courts may interfere and control the discretion of the directors and the operation of the road in matters that are not regulated by positive enactment in charter or statute.

3. How far the matter of regulating the kind, quality and amount of service is administrative and not judicial, and must proceed from legislation and not from judicial decision.

No citation of authority is necessary to establish the principle that a railroad is a *quasi*-public corporation. As such *quasi*-public corporation it may be compelled by the courts to perform to the fullest extent all duties enjoined upon it. The difficulty arises when we are called upon to determine whether any duty may properly be said to be enjoined upon it which is not contained in its charter or in some statutory provision. If it were a public corporation in the fullest sense of the word, as a municipality is, we find that the court will not require such public corporation to do anything except that which is enjoined upon it by charter or legislative enactment. A railroad corporation, it is frequently said, is chartered to serve the public with transportation facilities just as we may properly say that a municipality is chartered to furnish the public with certain governmental facilities. In the case of a municipal corporation, however, a *mandamus* will only be issued where the corporation has refused or neglected to perform a duty clearly enjoined upon it by charter or statute or law. I do not think it will be contended that a court would hold that, in the absence of a plain provision of charter or statute, it had the power to determine what was governmentally necessary, and enjoin its performance upon the municipality.

The supreme court of the United States has suggested that this subject of the regulation of the operation of carriers, in the matter of stations, frequency of trains and the like, is one for legislation and administration, and that the courts should not originate provisions with respect thereto, but should confine themselves to interpreting and applying them. *Northern Pacific Railroad Co. v. Washington, ex rel. Dustin, 142 U. S. 492; 35 L. Ed. 1092;* and similar reasoning will be found in the case of *Delaware, Lackawanna and Western Railroad Co. v. Central Stockyard, &c., Co., 45 N. J. Eq. (18 Stew.) 50* (at *p. 65 et seq.*) (*Vice-Chancellor Van Fleet, 1889*); *S. C. on appeal, 46 N. J. Eq. (1 Dick.) 280.*

It is, of course, conceded by all courts that where there is a positive enactment specifying that which the company must or must not do, the courts are the proper tribunals to enforce this positive duty, or to restrain action in excess of the power granted. But there are numerous cases, of which the present one is an example, in which there is no positive enactment, and in which the question must be squarely met as to the power of the court to interfere with the management and operation of a railroad upon the ground that it is not, in the court's view, properly serving the public.

The dependency of our population upon railroads is so great, and the business interests of the country are so interwoven with the transportation facilities, that there is practically no end to the questions which may arise in this connection. The places where trains shall be stopped, the number and speed of trains, the character of services rendered, are general heads which each contain innumerable examples.

I do not decide, because it is not within the province of a court of equity to originate legal principles, whether these questions are legislative or administrative, or whether they are judicial.

It is, however, of course, true that because they are difficult it is no reason why they should not be undertaken by a court if it be the duty of the court.

In a large number of our sister states it has been recognized that these questions can, at least, be much better dealt with by boards or commissions especially erected for this purpose, and

such states have, by legislation, so provided. For this reason there is not the bulk of law upon this subject-matter which one would expect. So many of the questions which arise between those who use the railroads and the companies are settled by these administrative bodies that the courts have not been appealed to so frequently, and there is not so much discussion of the power of the court as there otherwise would have been.

In this state, where we have no such administrative body, and where hardships and injuries may ensue to citizens and properties if railroads are allowed unrestrainedly to conduct their operations in a way to injure the citizen and his property, it is natural that applications should be made to courts of equity to restrain such invasions of what the citizen esteems to be his rights.

If the court could, without violating certain principles which I find to be absolutely settled in this state, grant to the complainants herein a preliminary injunction to hold matters in *statu quo* until the legal questions could be settled, I would find much reason for adopting that course, especially as by balancing the conveniences, as the court does in the matter of granting or withholding preliminary relief, the weight is all in favor of the complainants, because the injury which will ensue will surely affect them, while the defendant would merely be required to continue temporarily that which it has been voluntarily doing for some sixty years. But if the complainants have any right at all which a court may enforce, it is, as I have heretofore stated, a legal right, and the legal remedy is by *mandamus*.

The remedy by *mandamus,* however, is only effective to command the doing of an act which it is the corporate or official duty of the defendant to perform. It is not the equivalent of an injunction, and the court which has power to issue it has no means under its procedure to grant temporary relief pending the hearing and final disposition of the application for the writ. As a result there are many cases, of which this one may be an example, in which injury claimed to be irreparable will take place before the common-law court can decide the legal rights of the parties. Since, however, the hands of a court of equity are tied until such legal right is settled, or, to speak more

exactly, the legal principle has been settled, there is in the existing state of the law no provision for such a situation.

I think that it is a subject which should receive careful consideration by those who have the power to alter it, and that the rigidity of the present rules respecting the granting of preliminary injunctions to protect legal rights might well be relaxed in many cases so as to permit a court of equity to hold matters in *statu quo* until the rights of the parties may be settled at law.

Since this was a course which was urged upon me as a proper one to adopt in this case, so that the ends of justice might be served, I gave it the fullest consideration; but, in view of the decisions of the courts of this state bearing upon the questions which arise in this case, I reach the conclusion that, under our decisions, this course is not only unauthorized but would be directly in the face of the precedents.

The Erie Railroad Company, the defendant, is operating this part of its railroad under the provisions of the charter of the Paterson and Ramapo Railroad Company. This latter company was incorporated by an act passed on the 10th day of March, 1841. *P. L. 1841 p. 97.* It is not necessary to refer to this charter in detail further than to point out that there is no provision therein requiring the company to operate the road or to establish stations at any points.

My attention has not been directed to any legislation of this state respecting the location or maintenance of stopping places by railroads, and my own research has not resulted in finding any such statute.

To justify the court in granting the motion in this case the complainants must clearly establish the following principles:

1. That they have a right, equitable or legal, and, if legal, that it is clear and undisputed.

2. That irreparable injury will ensue if the preliminary injunction is not issued.

3. That this is a proper case for an injunction, at least partaking of a mandatory nature, to be issued upon preliminary hearing.

4. That the complainants have the right to compel the de-

fendant to perform its legal duty in the premises by injunction out of equity and not by *mandamus* at law.

1. I have already sufficiently stated my conclusions with respect to the character of the primary or fundamental right of the complainants, and have decided that such right is legal in its nature and not equitable.

The decisions in this state are numerous and positive that if the right of the complainant is legal and is not clear and undisputed, a preliminary injunction must not issue. *Morris and Essex Railroad* v. *Attorney-General and Prudden,* 20 *N. J. Eq.* (*5 C. E. Gr.*) *530* (*Court of Errors and Appeals, 1869*); *Stevens* v. *Paterson and Newark Railroad Co., 20 N. J. Eq.* (*5 C. E. Gr.*) *126* (*Chancellor Zabriskie, 1869*); *Hackensack Improvement Co.* v. *New Jersey Midland Railway Co., 22 N. J. Eq.* (*7 C. E. Gr.*) *94* (*Chancellor Zabriskie, 1871*); *Citizens Coach Co.* v. *Camden Horse Railroad Co., 29 N. J. Eq.* (*2 Stew.*) *299* (*Court of Errors and Appeals, 1878*); *Delaware, Lackawanna and Western Railroad Co.* v. *Central Stockyard, &c., Co., 43 N. J. Eq.* (*16 Stew.*) *77* (*Vice-Chancellor Van Fleet, 1887*); *affirmed, Idem 605; Dodge* v. *Pennsylvania Railroad Co., 43 N. J. Eq.* (*16 Stew.*) *351* (*Vice-Chancellor Van Fleet, 1887*); *affirmed, 45 N. J. Eq.* (*18 Stew.*) *366; Pennsylvania Railroad Co.* v. *National Docks, &c., Railway Co., 53 N. J. Eq.* (*8 Dick.*) *178* (*Court of Errors and Appeals, 1895*).

Can it be said that the legal right of the complainants in this case is clear?

I understand that what is meant by this rule is not that the precise question has ever been settled by the courts of law of this state, but that the precise principle has been thus settled.

The broad general principle has undoubtedly been settled in this state that common carriers are under a legal duty to serve the public, and in cases where, under their charters or under the statutes, a duty is manifested, the courts will compel them to perform such duty. *New York and Greenwood Lake Railroad Co.* v. *Montclair, 47 N. J. Eq.* (*2 Dick.*) *591* (*Court of Errors and Appeals, 1890*); *City of Bridgeton* v. *Bridgeton and Millville Traction Co., 62 N. J. Law* (*33 Vr.*) *592* (*Supreme Court, 1898*).

But the complainants in this case must go much further than this, and must demonstrate that the courts in this state have established the principle that at common law and in default of legislation a court of law will hold it to be the duty of a common carrier to locate stations at such points as the court shall determine, or at least not to discontinue stations at points where the court shall determine that they should remain. The complainants must show that our courts have established a principle which does not stop short of holding that the whole matter of regulating the method, manner, kind and quantity of service that common carriers shall render the public has, in cases in which the legislature has made no provision, been committed to the courts for determination and decision.

I am clearly of opinion that the principle contended for by the complainants must have the scope above indicated, if such principle exists at all.

No cases in New Jersey holding any such principle have been cited to me, nor have I found any.

I cannot see upon what ground a court may logically exert power to compel railroads to stop at certain places unless the court holds that it has power in every instance to determine, as between the public and the corporation, what the corporation must do to fulfill its legal duty to the public. If the discretion of the directors with respect to these unregulated matters has not been controlled or hampered by statute or charter, it seems to me that the court must either hold that such discretion is reviewable by the courts in every instance or that it is not reviewable at all.

Courts will compel the completion of a road if the charter clearly imposes that duty upon the company. They will also compel the operation of the road, and any other clear duty enjoined upon the corporation. *Spell. Inj. & Exlr. Rem. (2d ed.)* *p. 1377 ¶ 1593 et seq.;* see also note to *24 L. R. A. 564.*

The strongest argument which the complainants could make would be founded upon the decisions and opinions of the supreme court of the United States in the so-called "Granger Cases," beginning with *Munn* v. *Illinois, 94 U. S. 113; 24 L. Ed.* 77. A long and instructive note, with all the subsequent

decisions, will be found in *9 Rose's Notes on U. S. Reports, p. 21.* From what is said by the court in the *Munn Case,* one might be led to conclude that the court was the proper power to determine the measure of duty of common carriers even where there was no statutory or charter provision in respect to the subject-matter. But in subsequent cases in the same court it clearly appears that such was not the opinion of the court, and it did not so decide when that precise question and other analogous questions were raised and determined. *Texas and Pacific Railway Co.* v. *Marshall, 136 U. S. 393; 34 L. Ed. 385; Northern Pacific Railroad Co.* v. *Washington, ex rel. Dustin, 142 U. S. 492; 35 L. Ed. 1092; Jones* v. *Newport News, &c., Co., 65 Fed. Rep. 738; 31 U. S. App. 92; Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *People, 177 U. S. 514; 44 L. Ed. 868; Lake Shore and Michigan Southern Railway Co.* v. *Ohio, 173 U. S. 285; 43 L. Ed. 702; Inter-State Commerce Commission* v. *Cincinnati, New Orleans and Texas Pacific Railway Co., 162 U. S. 184; 40 L. Ed. 935; 167 U. S. 479; 42 L. Ed. 243.*

In some jurisdictions there seems to be an inclination, in default of positive legislation, to draw to the court power to regulate and enforce the duties of common carriers in these unregulated matters. *State* v. *Republican Valley Railroad Co., 17 Neb. 647; State, ex rel. Grinsfelder,* v. *Spokane, &c., Railway Co. (Wash.), 19 Wash. 518; 41 L. R. A. 515; Railroad Commissioners* v. *P. & O. C. R. R. Co., 63 Me. 269; 18 Am. Rep. 208; State* v. *H. & N. H. R. R. Co., 29 Conn. 538; Concord and Montreal Railroad* v. *Boston and Maine Railroad, 67 N. H. 464; 41 Atl. Rep. 263.*

In Illinois the courts have not been consistent, in my view. In some cases they have held that, although the subject was not regulated by charter or statute, the court had power to determine what the company should do and enforce its determination, while in other cases, which I cannot distinguish, they have held that it was entirely beyond the power of the court and must be left either to the discretion of the directors or must be remedied by legislation. *Ohio and Mississippi Railway Co.* v. *People, 120 Ill. 200; People, ex rel. Hunt,* v. *C. & A. R. Co.,*

130 Ill. 175; 152 Ill. 230; 26 L. R. A. 224; People, ex rel. Cantrell, v. St. L., &c., R. Co., 176 Ill. 512; 35 L. R. A. 656.

A territorial court in Washington (Northern Pacific Railway Co. v. Territory, 3 Wash. T. 303) affirmed the power of the court, but this case was reversed in the United States supreme court. Northern Pacific Railroad Co. v. Washington Territory, ex rel. Dustin, 142 U. S. 492; 35 L. Ed. 1092.

In other jurisdictions an opposite view is taken, and the power or authority of the court is denied. Northern Pacific Railway Co. v. Territory, ex rel. Dustin, supra; Texas and Pacific Railroad Co. v. Marshall, 136 U. S. 393; 34 L. Ed. 385; State, ex rel. Knight, v. Helena P. & L. Co. (Montana), 44 L. R. A. 692; People v. Albany and Vermont Railway Co., 24 N. Y. 261; People v. New York, Lake Erie and Western Railroad Co., 104 N. Y. 58; 21 Lawy. Ed. 784 (see note); People v. Brooklyn Heights Railroad Co., 172 N. Y. 90; 35 Lawy. Ed. 304 (see note to this case); Florida Central, &c., Railroad Co. v. Florida, 20 L. R. A. 419; San Antonio Street Railway Co. v. Texas, 35 L. R. A. 662; State, ex rel. Smart, v. Kansas City, &c., Railroad Co., 51 La. Ann. 205; 25 So. 129; Jones v. Newport News, &c., Co., 65 Fed. Rep. 738; 31 U. S. App. 92; Commonwealth v. Fitchburg Railroad Co., 78 Mass. 180; Whiting v. Sheboygan, &c., Railroad Co., 25 Wis. 167; 3 Am. Rep. 47.

It therefore is evident that it has not been settled at law that the complainants have the right they claim, and certainly it has not been settled that such right is clear and undisputed.

2. The complainants contend that irreparable injury will ensue if the preliminary mandatory injunction is not issued, and there is considerable force in the argument that harm which cannot be repaired will certainly happen to this community if it does not continue to have reasonable railroad facilities.

The company insists that it has and will continue to have reasonable railroad facilities because of the existence of the two stations nearest Hohokus, the one at Undercliff and that at Waldwick.

There is no village at the station of Hohokus, and the people

who use that station dwell, as it were, on the rim of the arc of a circle which radiates towards the station, and the other adjacent stations can be reached by them with varying degrees of convenience or inconvenience. Were there no other obstacle in the way of the complainants, I should be inclined to hold that the injury was shown to be sufficiently irreparable to authorize the issuance of the injunction, in view of the slight inconvenience to the defendant in continuing the operation of the road as heretofore. But in view of my decision upon other points of the case, I do not reach any decision upon this point.

3. My conclusion with respect to the unsettled principle upon which the complainants must rest their right, and my conclusion next to be stated with respect to the remedy, if any, which the complainants have, makes it unnecessary for me to determine whether this would otherwise be a proper case for a preliminary mandatory injunction.

But apart from the principle that such relief is, under our cases, granted only in rare instances and then apparently only to remove obstructions to easements and the like, it would seem that there is no authority for holding a case in equity until the rights can be settled at law, except where there is necessity for equitable relief after the common law courts shall have settled the legal rights. *Outcalt* v. *Helme Company, 42 N. J. Eq. (15 Stew.) 665* (at *p. 676*) (*Court of Errors and Appeals, 1887*).

There is no such need in this suit, because the ultimate relief at law and in equity is identical.

4. If the right which the complainants claim exists it is based upon the duty of the defendant, and this duty is enforceable by a court of law by *mandamus*. Whether the existence of the remedy by *mandamus* is effectual to disentitle the complainants to remedy in equity by injunction is the next consideration.

Since the final relief in either forum is identical, can it be said that in this case the remedy at law is not adequate?

I have pointed out in an earlier part of this opinion that in many cases the complainants' remedy would be entirely unavailing and useless if it could only be secured at the hands of a court of law which has not power to protect the situation pend-

ing the final decision. A remedy hardly seems to me to be entitled to be termed "adequate" if at the time that it is applied the rights of the complainant have so suffered that there may be nothing of value left to him in the remedy. But this feature of the inadequacy of the legal remedy, owing to the lack of power in the common law courts to protect the situation pending decision, has been directly passed upon by our court of errors and appeals in an analogous case.

In the case of *West Jersey Title and Guaranty Co.* v. *Barber, 49 N. J. Eq. (4 Dick.) 475 (Vice-Chancellor Pitney, 1892)*, in the court of chancery, the vice-chancellor pointed out that the legal right of the complainant, which was found to be clear, called for immediate protection, if protection was to be of any avail. In that case the complainant was one whose business it was to search titles. The entire income-producing value of the business depended upon its ability to obtain daily access to the records for the purpose of informing its clients of the state of such records. An interruption of this right must have caused irreparable injury, and the delay incident to appealing by *mandamus* to a law court must have resulted in practically putting the complainant out of business for the months which elapsed before the court could enforce upon the defendant the duty he owed to the complainant. A court of equity, by compelling the official to render to the complainant the legal duty which it found he owed the complainant, gave adequate remedy; the finding by the common law court, after months of delay, that the complainant had, at the time that he applied, a right to inspect the records, and the issuance of a *mandamus* to enforce that right, afforded almost no remedy of any value to the complainant. For these reasons the vice-chancellor held that *mandamus* was not an adequate remedy, and that the case called for and was a proper case in which to issue a mandatory injunction. The court of errors and appeals reversed this decree, and held that *mandamus* was the proper remedy, and that there was not therefore any remedy by mandatory injunction. *Barber* v. *West Jersey Title and Guaranty Co., 53 N. J. Eq. (8 Dick.) 158 (Court of Errors and Appeals, 1895)*.

In the case of *Atwater* v. *Delaware, Lackawanna and Western*

*Railroad Co., 48 N. J. Law (19 Vr.) 55 (Supreme Court, 1886)*, the plaintiff was refused a commutation ticket for the particular month for which he applied, and many months afterwards the court held that the company should have issued the ticket, and granted a *mandamus* that it should do so.

If *mandamus* was the proper remedy in this case, and such remedy is exclusive of a mandatory injunction, it will be seen that here again it is settled that, however apparently inadequate the remedy by *mandamus* is, it is the only remedy to enforce a clear legal duty of a corporate or official quality. And it was so held in the case of *New York and Greenwood Lake Railway Co.* v. *Montclair, 47 N. J. Eq. (2 Dick.) 591 (Court of Errors and Appeals, 1890)*.

In the case of *Bridgeton* v. *Bridgeton and Millville Traction Co., 62 N. J. Law (33 Vr.) 592 (Supreme Court, 1898)*, the supreme court held that the public duty which a street railroad company owed to operate a portion of its road, which it had previously operated and which it had abandoned, was enforceable "only" by *mandamus*.

And in the early case of *Rogers Locomotive and Machine Works* v. *Erie Railway Co., 20 N. J. Eq. (5 C. E. Gr.) 379 (Chancellor Zabriskie, 1869)*, it was held that an injunction would not be granted to compel a common carrier to transport goods at the rates fixed by law. I presume that this was upon the ground that *mandamus* was the proper remedy.

The courts of New York likewise deny the power of a court of equity to interfere by injunction. *People* v. *Albany and Vermont Railway Co., 24 N. Y. 261.*

Under the law as I find it I am constrained to deny the application for a preliminary injunction, and will so advise.